UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAMARKQUA GARLAND,

Petitioner,

-against-

SUPERINTENDENT, MARCY
CORRECTIONAL FACILITY,

Respondent.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/10/26

22-CV-08712 (JLR) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. JENNIFER L. ROCHON**

**BARBARA MOSES, United States Magistrate Judge.**

Petitioner Tamarkqua Garland, proceeding pro se, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. On May 8, 2015, after a jury trial in New York Supreme Court, Bronx County, petitioner was convicted of two counts of first-degree assault, in violation of New York Penal Law (PL) § 120.10(1), and one count of second-degree criminal possession of a weapon, in violation of PL § 265.03(3), and sentenced as a second violent felony offender to concurrent determinate terms of 14 years for each assault count and 10 years for the possession count, for an aggregate sentence of 14 years. Petitioner is serving his sentence at the Marcy Correctional Facility.

Petitioner asserts that he is entitled to the writ because: (1) his right to a speedy trial was violated; (2) the evidence was legally insufficient to support his conviction; (3) the police improperly arrested him after making a warrantless entry into the apartment where he was staying; (4) his post-arrest statements were coerced; (5) the prosecution withheld exculpatory evidence; (6) hearsay evidence was improperly admitted at trial, in violation of the Confrontation Clause; (7) the prosecutor committed misconduct during summation; (8) the trial court did not properly address concerns raised by a juror during deliberations; (9) petitioner's defense attorney at trial rendered ineffective assistance of counsel; and (10) the judge who denied petitioner's initial speedy trial motion filed a late oath of office.

For the reasons that follow, the petition should be denied.

## I.     BACKGROUND

### A.     Factual Background

At approximately 5:30 p.m. on October 9, 2010, Lloyd Bethea, then aged 15, observed a brawl in progress near his home on Van Nest Avenue in the Bronx. Trial Tr. (Dkt. 47-2 at ECF p. 103 through Dkt. 47-5 at ECF p. 43) at 37-38, 46.[1] Bethea remembered "someone firing down the block," hearing two bullets "fly past me," and then "feeling the impact" of something that "hit me in the leg," producing a "stinging, burning sensation." *Id*. at 39-40. Bethea's mother took him to the Jacobi Hospital emergency room, *id*. at 46, where X-rays showed that he had multiple bullet fragments in his left thigh. *Id*. at 287. The fragments were not removed, because – as explained by Dr. Anna Liveris, the People's medical expert – "going after a bullet like this can cause further injury," especially to nearby blood vessels. *Id*. at 289-90. Bethea was given a tetanus shot and antibiotics. *Id*. at 297-98. He was released from the hospital later that night with crutches, which he used for about two months. *Id*. at 40-41.

At trial – almost four years after the shooting – Bethea testified that he still had "little problems" with his leg, "like it will be sore at night," and "[w]hen it rains it disturbs me." Trial Tr. at 41. He was still able to play basketball and football "for the fun of it," but no longer played "at a team level," because his injury "would have been a very, very, very, very big risk." *Id*. at 58.

Bethea did not see the face of the person shooting the gun, Trial Tr. at 41, 66, but just before the shooting he saw one man "reach for something in [his] waistband" and pass it to another man, wrapped in a do-rag. *Id*. at 65. The man who received the item was a black male who wore

---

[1] Petitioner's trial took place on August 6, 7, 12, 14, 15, 18, 19, 20, 21 and 25, 2014. Witness testimony began on August 14 and continued through August 20, followed by summations, jury instructions, deliberations, and the verdict. "Trial Tr." refers to the continuously-paginated transcript of the proceedings on August 14 through August 25. All page citations are to the internal pagination of the trial transcript.

his hair in braids that hung below his ears. *Id*. at 66, 73-74. The only available video evidence – surveillance footage from a nearby corner – captured the shooting, but did not provide "a clear image of the face" or show "what the person looked like." *Id*. at 129-30, 153, 187, 501.[2]

New York Police Department (NYPD) Detective Sean O'Connell spoke to Bethea while he was in the hospital. Trial Tr. at 128-129; *see also* Supp. Tr. (Dkt. 47 at ECF pp. 1-219) at 16.[3] O'Connell then located a witness who identified the shooter by his last name – Garland – and provided two possible addresses for him. Supp. Tr. at 17-18. The following day, the same witness identified petitioner from a photo, *id*. at 19, at which point O'Connell completed a "want card" for petitioner (also known as an investigation card or "I card"), which is used "when you're in search of an individual who is a suspect in a crime." *Id*. Early in the morning on October 11, 2010, NYPD Detective Gordon Brown, accompanied by other NYPD officers, went to one of the addresses provided by the witness, identified himself, and was admitted by Deborah Toney, the "head of household." *Id*. at 71. Brown told Toney he was looking for Garland, and Toney pointed out the room where he slept. *Id*. at 71-72. Petitioner then emerged from that room, was taken into custody, and was transported to the 49th Precinct, where he arrived at about 8:00 a.m. *Id*. at 72, 74.

Detective Brown further testified that there was "[n]othing unusual" about petitioner's physical condition that day, Supp. Tr. at 74, and that he never complained about feeling ill, hung over, or nauseous. *Id*. at 97. Petitioner, however, testified at the suppression hearing that he had been drinking the night before; that his head and stomach hurt; that he repeatedly asked for water,

---

[2] Respondent did not provide the video evidence to this Court. On direct appeal of his conviction to the Appellate Division, petitioner stated that the video "showed a person pointing in the direction of the crowd with his arm raised at approximately eye-level, and hopping while shaking his arm." Respondent's Appendix (Resp. App.) (Dkts. 35-1 through 35-10) at A-029.

[3] The suppression hearing was held on August 4 and 5, 2014. "Supp. Tr." refers to the continuously-paginated transcript of the proceedings on those two days. All page citations are to the internal pagination of the suppression transcript.

but was ignored; and that while being transported he asked for a bag "because I felt like I was going to throw up." *Id*. at 104-105, 114-15, 141-44.

Once petitioner was at the precinct, Detective O'Connell "let[] him know what he had been arrested for," Supp. Tr. at 20-21, and then – after taking several hours to complete his "arrest paperwork" – O'Connell read petitioner his *Miranda* rights at "around noon," and petitioner signed a form saying that he had been advised of his rights and was willing to answer questions. *Id*. at 21-22. O'Connell then "asked him to explain what had happened," *id*. at 21-22, which he did. *Id*. at 25. At around 1:15 p.m., petitioner hand-wrote and signed a three-page statement, followed by an addendum approximately 15 minutes later. *Id*. at 25-27. Petitioner wrote that he was initially involved in an unarmed melee, when he saw a larger "mob" approaching, armed with "bats, pipes, sticks, rocks and socks, knives." *Id*. at 30. Petitioner "told the crowd to fall back," but one man "pulled a gun out and [shot] off the first one." *Id*. Petitioner then grabbed the gun himself and shot "in the air of the crowd to back off." *Id*. Once petitioner stopped shooting, "the guy took [the gun] from [him] and went his way." *Id*. In the addendum, petitioner wrote that he acted in "self-defense" (underlining that phrase twice) and did not want anyone to be hit. *Id*. at 31-32. He reiterated, however, that he "grabbed the gun" and "shot it about five times[.]" *Id*. at 31.

According to Detective O'Connell, petitioner did not complain about feeling sick or ask for medical attention during the questioning at the precinct. Supp. Tr. at 35-36, 51. O'Connell was "sure" that petitioner signed the *Miranda* form before he wrote out his statements, *id*. at 56, and "one hundred percent" certain that petitioner did not ask for an attorney. *Id*. at 64.

Once again, petitioner's account is quite different. According to petitioner, he asked for water and to use the bathroom when he arrived at the precinct, but was told to wait. Supp. Tr. at 116-18. In the interrogation room, he asked again for water, as well as for "my one phone call"

4

and "my attorney," *id*. at 122, to no avail. He was uncuffed when Detective O'Connell arrived, and told why he was arrested, *id*. at 125, but was not read his *Miranda* rights until "after the false statement was written." *Id*. at 125-26. During the interrogation, petitioner again asked for a phone call and an attorney, and said he was feeling sick, but O'Connell told him to "write the statement out first[.]" *Id*. at 133-34. Petitioner testified that he wrote a total of four statements. *Id*. at 127. Detective O'Connell threw away the first one, saying that it "wasn't good enough." *Id*. at 127. The second statement was discarded after petitioner "threw up on it." *Id*. at 128. Only after he wrote the third and fourth statements – the statements the People intended to introduce – was he read his *Miranda* rights, at which point he signed the form. *Id*. at 139. Petitioner conceded that when he arrived at court later that day, he did not request medical attention. *Id*. at 147. However, he maintained that he was "coerced" into writing both of the surviving statements – including the exculpatory portions, such as the passage in the addendum stating that he acted in "self-defense." *Id*. at 149, 167-68. That portion, according to petitioner, was true. *Id*. at 170. Additionally, petitioner volunteered that the detective "actually wanted me to write that I was the one who did everything, who started everything, and I wasn't writing that because I wasn't – that wasn't true." *Id*. at 167.

> **B.    Arraignment, Indictment, and CPL § 30.30 Motion**

Petitioner was arraigned on a felony complaint on October 12, 2010, and indicted by the grand jury on November 4, 2010, on one count of attempted second-degree murder, three counts of first-degree assault, two counts of second-degree criminal possession of a weapon, one count of third-degree criminal possession of a weapon, three counts of second-degree assault, one count of first-degree reckless endangerment, one count of third-degree assault, one count of fourth-degree criminal possession of a weapon, and one count of second-degree reckless endangerment. *See* Resp. App. at A-02, A-092.

5

On October 31, 2013, the court (Carter, J.) denied petitioner's motion to dismiss the indictment pursuant to N.Y. Crim. Proc. Law (CPL) § 30.30. Resp. App. at A-01. Section 30.30, which is "sometimes referred to as the New York 'statutory' speedy-trial requirement," *Olsen v. Doldo*, 2020 WL 685707, at *24 (S.D.N.Y. Jan. 2, 2020), *adopted,* 2020 WL 635605 (S.D.N.Y. Feb. 11, 2020)), requires the People to be ready for trial in a felony case within six months of arraignment, subject to various exclusions. CPL § 30.30(1)(a). Justice Carter found that as of the date of his decision – more than three years after petitioner was arraigned – only 135 days were "chargeable to the People," Resp. App. at A-01, A-06, and thus that the statute was not violated.

### C.    Suppression Hearing

At the pretrial suppression hearing, petitioner's counsel, Paul London, argued that the oral and written statements that his client made on October 11, 2010 should be suppressed because they were coerced in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966), and because they resulted from the warrantless entry into Ms. Toney's home, in violation of the Fourth Amendment and *Payton v. New York*, 445 U.S. 573 (1980). The court (Benitez, J.) rejected petitioner's arguments, finding the testimony of Detectives O'Connell and Brown credible, and the testimony of petitioner "not credible," Supp. Tr. at 207, in part because he "seem[ed] to interject or eject every conceivable type of wrongdoing that the police could have engaged in." *Id.* at 211. With regard to petitioner's arrest, Justice Benitez found that the police had probable cause, based on the information provided by the eyewitness who identified him as the shooter, and that Toney voluntarily admitted the NYPD to her apartment, where the arrest took place. *Id*. at 213-15. With regard to the interrogation, Justice Benitez found that petitioner "was not intoxicated or ill to the extent that his will was overborne by any actions of the police"; that the police "did not perceive any type of illness or intoxication" on petitioner's part, much less take advantage of it; that prior to petitioner's custodial interrogation, Detective O'Connell told him what he had been arrested for

6

and advised him of his *Miranda* rights; and that petitioner knowingly waived his right to remain silent and his right to counsel before voluntarily answering questions and writing the two statements that the People sought to introduce at trial. *Id.* at 215-19. Consequently, the court denied petitioner's suppression motion "in all respects." *Id.* at 219.

### D.     Trial

Petitioner's trial commenced before Justice Benitez on August 6, 2014. After jury selection and opening statements, the People called five witnesses: Lloyd Bethea, Dr. Liveris, Detective O'Connell, Nancy Grasso, and Detective Jeffrey Bahm. The testimony of Mr. Bethea and Dr. Liveris is described above. Ms. Grasso was an official court reporter for the Bronx County Criminal Court. Trial Tr. at 307-8. She testified (based on her contemporaneous transcript) that during petitioner's arraignment, on October 12, 2010, the prosecutor stated that Garland shot five times, towards "at least twenty people." Trial Tr. at 313. Petitioner then interjected that he fired the shots "[i]n the air. I wasn't . . . ," at which point he was shushed by his attorney. *Id.*

Detective O'Connell testified, much as he had at the suppression hearing, that on October 10, 2010 – the day after the shooting – he canvassed the neighborhood for witnesses and video evidence, and issued a "want card" for petitioner. Trial Tr. at 129-31. O'Connell first saw petitioner on October 11, 2010, at the 49th Precinct, where he advised him of his rights, at which point petitioner "signed the form and indicated he was willing to answer questions[.]" *Id.* at 131-32, 146. After answering questions verbally, petitioner hand-wrote and signed his three-page statement, followed by his one-page addendum, both of which were admitted into evidence and read to the jury. *Id.* at 148-53. On cross-examination, Detective O'Connell acknowledged that "the only ballistics recovered from the scene were . . . five shell casings," and that the gun itself was never recovered. *Id.* at 190-91. O'Connell again denied that petitioner asked for a lawyer, *id.* at 196; denied that petitioner told him that he was hung over or asked for medical attention, *id.* at 214;

7

stated that he did not remember petitioner throwing up (which was something he would remember if it happened), *id*. at 197-98; and denied that he "suggested" what petitioner should write in his statements or promised to "help" him if he made a statement. *Id*. at 206-08.

Detective Bahm, a ballistics expert, testified that the five shell casings recovered at the scene were .32 caliber shell casings and that they were all fired from the same firearm, namely, a ".32 auto, semiautomatic pistol." Trial Tr. at 353-57.

After the People rested their case, defense counsel informed the court that petitioner had elected not to testify at trial. Trial Tr. at 375. At counsel's request, Justice Benitez allocuted petitioner as to that issue, and petitioner confirmed: "I don't want to testify." *Id*. at 377. Counsel then moved to dismiss, arguing – as relevant here – that the evidence failed to demonstrate two essential elements of the first-degree assault counts: that petitioner intended to cause "serious physical injury" to any person, *id*. at 385, and that the injury actually inflicted on Bethea was a "serious physical injury," as that term is used in PL § 120.10(1) and (3). *Id*. at 385-86. Justice Benitez rejected petitioner's arguments on both points, concluding that firing a weapon into a crowd shows an intent to cause a serious physical injury, *id*. at 386, and that the jury could find that Bethea's use of crutches for two months was sufficient to show that he experienced a "protracted impairment of health," *id.* at 387-391, and thus that he suffered a "serious physical injury." *Id*. at 391-92.

The defense then rested without calling any witnesses. *Id*. at 393.

In summation, attorney London argued that the People failed to meet their burden of proof because – among other things – the victim could not identify petitioner as the shooter, *see* Trial Tr. at 446; the video did not clearly identify the shooter, *see id*. at 462, 476; no gun was ever recovered, *see id*. at 462, 464; and petitioner's written statements were the product of manipulation

by Detective O'Connell, whose testimony – according to counsel – was not credible. *Id*. at 447-49, 464-70. Counsel further argued that Bethea "exaggerated" his injury, which in reality was not "serious." *Id*. at 455, 457-59.

Assistant District Attorney (ADA) Michael Schordine began by arguing that it was petitioner who "shot into that crowd and hit that young boy in the leg, sent him to the hospital, it knocked him off the Christopher Columbus football team, couldn't play anymore, left him with crutches for months and bullets – bullet fragments in his leg to this very day." Trial Tr. at 479. The ADA emphasized how serious a shooting is and how lucky Bethea was not to be even more seriously injured. *Id.* at 483. He also reminded the jurors that Bethea had to use crutches for two months, *id*. at 490, had to "give up organized football," and would "live his entire life with those bullets in his leg[.]" *Id*. at 491.

With regard to petitioner's culpability, ADA Schordine leaned heavily on the statements that he made at the 49th Precinct, his spontaneous outburst during his arraignment the next day, and the surveillance video. Petitioner's written statements, according to the ADA, were not coerced in any way, *id*. at 481-82, and in fact were designed by petitioner to minimize his culpability and manufacture a claim of self-defense. *Id*. at 499-500. However, the ADA argued, they established that petitioner was the shooter seen on the surveillance video, *id*. at 482, 484, 486, 502, and that he shot five times (as confirmed by the ballistics evidence). *Id*. at 494. The video, in turn, established that there was only one shooter, and that he shot into the crowd, not "in the air" or in "self-defense," as petitioner claimed. *Id*. at 482-87. According to the ADA, "[y]ou don't point a gun at a group of people, and pull that trigger five times, unless you want to kill someone in that group[.]" *Id*. at 488. Therefore, he argued, although petitioner never revealed "who he was shooting

9

at," he was guilty of attempted murder in the second degree and assault in the first degree, as well as criminal possession of a weapon in the second degree. *Id*. at 488, 507-11.

### E.   Jury Charge and Deliberations

After the summations, Justice Benitez charged the jury on four counts: attempted murder in the second degree under PL §§ 110 and 125.25(1); assault in the first degree under PL § 120.10(1); assault in the first degree under § PL 120.10(3); and criminal possession of a weapon in the second degree under PL § 265.03(3). Trial Tr. at 536.

The jurors began deliberating on Thursday afternoon, August 21, 2014, *see* Trial Tr. at 554, and at the end of the day they were told to return on Monday morning, August 25. *Id*. at 564-66. Juror No. 2 then advised the court, "I don't want to be part of the jury no more." *Id*. at 567. When asked why, he responded, "because I just don't." *Id*. at 568. When asked to elaborate, he said, "Okay. I'm just not getting along with the rest of the jury for one reason. But I have other reasons, though, that's personal, I really don't care to discuss around everybody." *Id*. Justice Benitez explained that it was not uncommon for jurors to disagree, "particularly when they first begin their deliberations," *id*. at 569, and encouraged Juror No. 2 to relax over the three-day weekend, and then "listen to their opinions, share your opinions and see where the jury and where you go from there." *Id*. at 569-70. The juror asked, "So if I come back Monday and make the same request, then what?" to which Justice Benitez replied, "Well, I'll deal with that on Monday[.]" *Id*. at 570. After Juror No. 2 left the courtroom, attorney London told the judge that his approach was "[a]bsolutely correct." *Id*. at 571. Juror No. 2 never renewed his request to be released from the jury.

### F.   Verdict and Sentence

On Monday afternoon, August 25, 2014, the jury returned its verdict. Trial Tr. at 579-80. Petitioner was found not guilty of the top charge – attempted murder in the second degree – but guilty of both first-degree assault charges and the weapon possession charge. *Id*. at 581-82.

After the verdict, but before sentencing, petitioner attempted to file a pro se motion to set aside the verdict pursuant to CPL § 330.30, and asked that attorney London be replaced as his defense counsel because he was not willing to adopt that motion. *See* 12/5/14 Tr. (Dkt. 47-5 at ECF pp. 44-88) at 17-19. Justice Benitez found that London "made a proper determination that [the § 330.30 motion] was not warranted," *id*. at 24, but agreed to appoint new counsel after London asked to be relieved, citing a deteriorating relationship with his client. *Id*. at 24, 31-38.

Attorney David Farman, appointed as petitioner's counsel in place of London, agreed to file a CPL § 330.30 motion on his behalf. *See* Resp. App. at A-179. The motion asked Justice Benitez to "reconsider" Justice Carter's October 31, 2013 decision denying petitioner's pretrial statutory speedy-trial motion, and to hold that the People violated CPL § 30.30(1)(a) by being "not ready" for trial for "405 chargeable days" after arraignment. Resp. App. at A-180, A-185. Justice Benitez denied the motion on May 8, 2015, *see* Sentencing Tr. (Dkt. 47-5 at ECF pp. 89-118) at 2; 5/8/15 Dec. & Order (Dkt. 48), holding that "the motion court properly denied defendant's statutory speedy trial motion." 5/18/15 Dec. & Order at 5.

That same day, Justice Benitez sentenced appellant as a second violent felony offender to 14 years in prison for each assault count and 10 years for the weapon possession charge, all to run concurrently, plus five years post-release supervision on all counts. *Id*. at 19-24.

**G.    Direct Appeal**

On direct appeal to the New York Appellate Division, petitioner argued (1) that the trial court erroneously denied his pretrial CPL § 30.30 motion, thereby depriving him of his speedy trial rights under state law, *see* Resp. App. at A-20, A-037 to A-049; (2) that the evidence was legally insufficient to support the assault convictions, in violation of the Fourteenth Amendment and *Jackson v. Virginia*, 443 U.S. 307 (1979), because it did not establish that Bethea sustained a "serious physical injury," or that petitioner "intended to cause serious physical injury," and that the

11

weapon possession conviction was "against the weight of the evidence," *id.* at A-020, A-050 to A-058; (3) that petitioner was deprived of a fair trial, in violation of state law and the Fourteenth Amendment, because of improprieties in the People's summation, *id.* at A-020, A-058 to A-068; and (4) that petitioner's post-arrest statements were improperly admitted, in violation of state law and the Fourth, Fifth, and Fourteenth Amendments, because the People failed to prove that they were voluntary or that the police had consent to enter Ms. Toney's home to arrest him without a warrant. *Id.* at A-020, A-068 to A-080.

In a reasoned opinion issued on November 28, 2017, a split panel of the Appellate Division affirmed the conviction. *People v. Garland*, 155 A.D.3d 527, 65 N.Y.S.3d 167 (1st Dep't 2017). The majority held (1) that the trial court "properly denied defendant's speedy trial motion," *id.* at 527, 65 N.Y.S.3d at 169; (2) that "[t]he verdict was supported by legally sufficient evidence and was not against the weight of the evidence," *id.* at 528, 65 N.Y.S.3d at 169; (3) that "defendant failed to preserve his challenges to the People's summation," and that, in any event, "[t]he bulk of the challenged remarks were either [a] fair response to defense counsel's arguments on summation or fair comment on the evidence, and any improprieties were not so egregious as to deprive defendant of a fair trial," *id.* at 529, 65 N.Y.S.3d at 170; and (4) that "the People showed that the officers had obtained voluntary consent to enter the apartment from a person with the requisite authority," and "the People also met their burden of demonstrating that defendant waived his *Miranda* rights and made the written statement[s] voluntarily." *Id.* at 528, 65 N.Y.S.3d at 169.[4]

---

[4] One justice dissented in part, opining that "the evidence at trial was legally insufficient to establish the element of 'serious physical injury,' defined as 'physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ[.]'" *Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170 (Manzanet-Daniels, J.P., dissenting) (quoting PL § 10.00(10)). Therefore, in Justice Manzanet-Daniels' view, "the convictions for assault in the first degree under PL §§ 120.10(1) and 120.10(3) should be reversed." *Id.*

12

Petitioner filed a timely appeal to the New York Court of Appeals, by permission, arguing (1) that the evidence was legally insufficient to support the two assault counts, in violation of the Fourteenth Amendment, because "Lloyd Bethea did not suffer a serious physical injury as a matter of law," Resp. App. at A-143; (2) that petitioner's statements were improperly admitted, in violation of state law and the Fourth and Fourteenth Amendments, because the evidence was insufficient to prove that Toney's consent for the police to enter her home was voluntarily and freely given, *id*. at A-147; and (3) that petitioner's trial counsel was ineffective, in violation of the Sixth and Fourteenth Amendments, because he "allowed the prosecutor to engage in a shockingly broad array of misconduct in summation." *Id*. at A-152. In a pro se supplement to his counsel's brief, petitioner argued, among other things, that his speedy trial rights were violated, *id*. at A-161; that many items of "exculpatory evidence" were withheld, in violation of *Brady v. Maryland*, 373 U.S. 83 (1979), *id*. at A-165; that a hearsay "police report" was admitted at trial, *id*. at A-167; and that Justice Carter, who denied petitioner's pre-trial speedy trial motion, lacked authority to do so because he filed "a late oath of office." *Id*. at A-172.

In a reasoned opinion dated November 20, 2018, the Court of Appeals, on a 5-2 vote, affirmed the Appellate Division. *People v. Garland*, 32 N.Y.3d 1094, 90 N.Y.S.3d 618 (2018). After close analysis of the evidence presented at trial, the Court of Appeals held that it was sufficient to establish the "serious physical injury" element of petitioner's first-degree assault convictions. *Id*. at 1096, 90 N.Y.S.3d at 620. Judge Wilson, joined by Judge Rivera, dissented, writing that the trial evidence did not "meet the statutory definition of 'serious physical injury'" because Bethea was "not at substantial risk of dying; he has no serious disfigurement; he has no protracted health impairment and has not lost the function of any bodily organ." *Id*. at 1098, 90 N.Y.S.3d at 621.

On April 2, 2019, the Court of Appeals denied petitioner's motion for reargument, *People v. Garland*, 33 N.Y.3d 970, 100 N.Y.S.3d 213 (2019), and on March 23, 2020, the United States Supreme Court denied *certiorari*. *Garland v. New York*, 589 U.S. 1280 (2020).

**H.    CPL § 440.10 Motion**

On July 14, 2020, petitioner filed a pro se motion to vacate his conviction pursuant to CPL § 440.10, arguing, among other things: (1) that his speedy trial rights were denied; (2) that his "coerced involuntary false confession" should not have been admitted in evidence; (3) that the People withheld (unspecified) exculpatory evidence; (4) that he was prejudiced by hearsay testimony from Detective O'Connell; and (5) that his trial counsel was ineffective. Resp. App. at A-213, A-217, A-220. On November 22, 2021, the court (Carter, J.) denied the motion, explaining that petitioner's speedy trial and involuntary confession claims could not be relitigated under CPL § 440.10 after having been considered and rejected on his direct appeal. Resp. App. at A-254. Likewise, the state court rejected petitioner's hearsay claim because it "could have been brought up on direct appeal but was not." *Id*. at A-257. Justice Carter considered petitioner's *Brady* claim on the merits, but rejected it because petitioner offered no evidence (not even his own affidavit) to substantiate it. *Id*. at A-255. Finally, Justice Carter rejected petitioner's ineffective assistance of counsel claim both because he failed to provide any "reasons for his belief" that any of his attorneys were ineffective and because the record showed that "they each exercised their duties effectively by making appropriate pre-trial, trial, post-conviction and appellate arguments." *Id*. at A-257.

Insofar as the record before this Court reflects, petitioner did not seek leave to appeal the denial of his CPL § 440.10 motion to the Appellate Division.

**I.    Habeas Petition**

On June 13, 2022, petitioner filed a pro se pleading in the United States District Court for the Eastern District of New York which invoked 28 U.S.C. § 1983, and named Justice Carter and

14

ADA Schordine as defendants, but appeared to challenge the constitutionality of his 2015 conviction. (Dkt. 1.) On October 4, 2022, the case was transferred to this District (Dkts. 5, 6), and on October 24, 2022, the Chief United States District Judge recharacterized the pleading as a petition for *habeas corpus* pursuant to 28 U.S.C. § 2254, and directed Garland – should he wish to proceed under § 2254 – to submit an amended petition within 60 days. (Dkt. 7.)

On December 12 and 19, 2022, petitioner filed two substantially similar handwritten documents, each entitled Amended Petition and submitted on a form designed for use by persons in state custody seeking relief under 28 U.S.C. § 2254. *See* 12/12/22 Pet. (Dkt. 10) (signed); 12/19/22 Pet. (Dkt. 14) (unsigned). He then filed a typed letter dated January 2, 2023. *See* 1/2/23 Ltr. (Dkt. 16) (unsigned). On January 12, 2023, the Hon. Jennifer L. Rochon, United States District Judge, to whom the case had been reassigned, construed these three documents together as the operative Amended Petition, and directed the respondent to answer. (Dkt. 19.) On January 17, 2023, Judge Rochon referred the case to me for report and recommendation. (Dkt. 21.)

Because petitioner is proceeding pro se, "his petition is 'read liberally and should be interpreted to raise the strongest arguments that [it] suggest[s].'" *Silva v. Keyser*, 271 F. Supp. 3d 527, 538 (S.D.N.Y. 2017) (alterations in original) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)), *appeal dismissed*, 2018 WL 1831778 (2d Cir. Mar. 26, 2018). So construed, the Amended Petition asserts ten separate claims: (1) that petitioner's right to a speedy trial was violated; (2) that the evidence was legally insufficient to support his conviction; (3) that the police improperly arrested him after making a warrantless entry into the apartment where he was staying; (4) that his post-arrest statements were coerced; (5) that the People withheld exculpatory evidence; (6) that hearsay evidence was improperly admitted at trial, in violation of the Confrontation Clause; (7) that ADA Schordine committed misconduct during summation; (8) that the trial court did not

properly address the concerns raised by Juror No. 2 during deliberations; (9) that attorney London rendered ineffective assistance of counsel; and (10) that Justice Carter filed a late oath of office.

On February 13, March 10, and April 4, 2023, petitioner filed various documents in further support of his Amended Petition. (Dkts. 23, 24, 31, 32.) On June 26, 2023, respondent filed its Answer and supporting brief in opposition to the Amended Petition (Resp. Mem.) (Dkt. 35), together with its Appendix.

On July 20 and August 8, 2023, petitioner filed two different versions of his reply brief in further support of his petition. (Dkts. 39, 40.) The Court accepted both, but advised petitioner that "no further papers in support of the Petition for Writ of Habeas Corpus will be accepted." (Dkt. 41.) On October 6 and December 23, 2023, petitioner filed two additional briefs (Dkts. 42, 45), portions of which appeared to seek damages for injuries that he has suffered while incarcerated. The Court has disregarded these papers. Thereafter – at the Court's request – respondent filed the state court transcripts reflecting the underlying proceedings in New York Supreme Court, Bronx County and Justice Benitez's May 8, 2015 order denying petitioner's CPLR § 330.30 motion.

## II.   LEGAL STANDARDS

### A.   Timeliness

Under 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner must file his habeas corpus petition within one year of the date his conviction becomes "final by the conclusion of direct review or the expiration of the time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A). The one-year period is tolled while "a properly filed application for State post-conviction or other collateral review," such as a CPL § 440.10 motion, remains pending. *Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000); *see also Sunter v. Capra*, 2016 WL 836346, at *3 (S.D.N.Y. Feb. 29, 2016). Time begins to run again on the date

16

the state court issues a final order in the collateral proceeding and further appellate review is unavailable. *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000).

Here, respondent does not challenge the timeliness of the petition, and I agree that it is timely. Petitioner's conviction became final, and the one-year AEDPA limitations period began to run, when the Supreme Court denied *certiorari* on March 20, 2020. But on July 14, 2020 – 116 days after the conviction became final – petitioner filed his CPL § 440.10 motion, which was denied on November 22, 2021. The statute was therefore tolled from March 20, 2020 until at least December 22, 2021. *See* CPL § 460.10(4)(a) (giving a defendant 30 days "after service upon [him] of a copy of the order sought to be appealed" to apply for leave to appeal to the Appellate Division).[5] Petitioner filed this action 173 days later, on June 13, 2022, well within the one-year period prescribed by AEDPA.

### B.      Exhaustion and Procedural Default

Exhaustion of state court remedies is a condition precedent to federal habeas relief. 28 U.S.C. § 2254(b)(1)(A). "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures," *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022), thereby "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (*per curiam)* (cleaned up). To provide the State with the necessary "opportunity," the prisoner must invoke "one complete round of the State's established appellate review process,"

---

[5] Respondent advises the Court that notice of entry of the CPL § 440.10 motion was not mailed to petitioner until May 31, 2023. *See* Resp. Mem. at 3 n.1. If so, his time to apply for leave to appeal to the Appellate Division did not expire until June 30, 2023 – by which time he had already filed his *habeas* petition. *See Bennett*, 199 F.3d at 120-21 (holding that where the petitioner was never served with a copy of the order denying his CPL § 440.10 motion, his time for appealing that denial "has not yet expired," making his *habeas* petition timely).

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), during which he "must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Henry*, 513 U.S. at 365-66).

To "fairly present" a claim, a petitioner must identify both the facts that entitle him to relief, *Picard v. Connor*, 404 U.S. 270, 276-77 (1971), and the federal constitutional basis for the claim. *Henry*, 513 U.S. at 365-66. There are a number of ways to accomplish this task, *see Rustici v. Phillips*, 308 F. App'x 467, 469 (2d Cir. 2009) (summary order), and the petitioner need not cite "book and verse on the federal constitution." *Picard*, 404 U.S. at 278. However, the claim must be presented with enough specificity to permit the state court to address it. *See, e.g.*, *Gray v. Netherland*, 518 U.S. 152, 153 (1996) (it is not "enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court").

"As a general matter, unexhausted claims must be dismissed without prejudice to afford the petitioner an opportunity to exhaust the claim in state court." *Rodriguez v. Sheaham*, 2016 WL 3522278, at *3 (S.D.N.Y. June 21, 2016) (citing *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). In other words, a court may "deny – but not grant" unexhausted claims on the merits. *Bordas v. Walker*, 2000 WL 1867915, at *4 (S.D.N.Y. Dec. 20, 2000).

If a petitioner has failed to exhaust his claims in state court, but no longer has a procedural avenue to do so, his claims are deemed exhausted but "procedurally defaulted" (or "procedurally barred"), precluding federal *habeas* review. *Coleman v. Thompson*, 501 U.S. 722, 728, 731-32, 744-45 (1991). As the Supreme Court explained, "a habeas petitioner who has failed to meet the

18

State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 731-32; *accord Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) ("[I]f the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule, we must deem the claim procedurally defaulted.") (quoting *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001)) (internal quotations omitted).

Even if a petitioner has fairly presented all of his claims in state court, federal *habeas* review is barred if the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment," such as where the state court "decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). For a state law procedural ground to be "independent," the state court must have actually relied on that ground as a sufficient basis for its ruling. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989) (independent and adequate state grounds exist if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar") (internal quotations omitted). However, as long as the state court is "explicit in its reliance on a procedural default," federal *habeas* review is barred even if the state court chooses, as an alternative holding, to address the merits of the constitutional claim. *Id.* at 264 & n.10 (federal courts must "honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law"). For a state law procedural ground to be "adequate," the procedure must be "firmly established and regularly followed by the state in question." *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (quoting *Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir. 2003)).

19

A procedurally defaulted claim must be dismissed with prejudice, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To establish "cause" for a procedural default, the petitioner must show that "some objective factor, external to [his] defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012). To establish "prejudice," the petitioner must show that the default "resulted in 'substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions.'" *Id.* at 112 (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)). To establish a "fundamental miscarriage of justice" (which, in the Supreme Court's "collateral-review jurisprudence . . . means that the defendant is actually innocent," *United States v. Olano*, 507 U.S. 725, 736 (1993)), the petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### C.      Merits

Federal claims that have been decided on the merits in the last reasoned state court ruling are reviewable in federal district court under AEDPA's deferential standard of review. That standard permits a district court to grant habeas relief only when the state court's opinion:

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"Clearly established" federal law means "the holdings, as opposed to the dicta," of the decisions of the United States Supreme Court "as of the time of the relevant state-court decision," and does not include opinions of lower federal appellate courts. *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

This standard is intentionally difficult to meet, and "sharply limits federal review of habeas claims raised by state prisoners." *Klein v. Martin*, 607 U.S. ___, 2026 WL 189976, at *4 (Jan. 26, 2026). AEDPA permits federal courts to "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents," but "goes no further." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A federal court cannot grant habeas relief "simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Similarly, an adjudication of a claim is not based on an unreasonable determination of facts "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). In short, "in order to obtain federal habeas relief, a state prisoner must show far more than clear error. The habeas claimant must instead establish that the state court blundered so badly

21

that every fairminded jurist would disagree with the decision." *Martin*, 2026 WL 189976, at *4 (cleaned up).

### III.   DISCUSSION

#### A.   Speedy Trial

In this Court, petitioner claims – repeatedly – that his statutory speedy trial rights were denied in violation of CPL § 30.30. *See*, *e.g*., 12/12/22 Pet. at ECF pp. 5, 7-8 ("CPL 30.30 speedy trial violation by 3 years 10 months prior to trial"); 12/19/22 Pet. at ECF pp. 7, 9-10, 12 (same). In his January 2, 2023 letter, he adds that there was a "Constitutional violation to the Speedy Right Clause Act of the Sixth Amendment to the United States Constitution." 1/2/23 Ltr. at ECF p. 3.

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." *Ponnapula v. Spitzer,* 297 F.3d 172, 182 (2d Cir. 2002) (citation omitted). Consequently, to the extent petitioner's speedy trial claim is based on CPL § 30.30, "the claim is not cognizable on federal habeas review." *Cooke v. Graham,* 2009 WL 3111790, at *7 (E.D.N.Y. Sept. 28, 2009) (collecting cases); *see also Brown v. New York*, 2025 WL 1351613, at *10 (S.D.N.Y. May 8, 2025) ("[S]tate law claims, such as denial of a speedy trial under CPL § 30.30, are not cognizable in a habeas petition."); *Richardson v. Miller*, 2024 WL 763395, at *11 (S.D.N.Y. Feb. 23, 2024) ("Because Section 30.30 is purely a creature of state law and does not protect a federal constitutional right, Richardson's speedy trial claims under Section 30.30 are not cognizable on habeas review."); *Wilson v. Goord,* 2004 WL 226149, at *4 (S.D.N.Y. Feb. 6, 2004) ("[E]ven if Petitioner's statutory speedy trial right was violated, Petitioner has failed to raise a constitutional claim that is cognizable on federal habeas corpus review.").

To the extent petitioner's speedy trial claim is based on the Sixth Amendment, it is cognizable in this forum if properly exhausted. In the Appellate Division, petitioner argued only

22

that "[t]he § 30.30 court" erred. *See* Resp. App. at A-037 to A-049. He did not mention the Sixth Amendment, much less present any substantive argument that implicated his federal speedy trial rights.[6] Likewise, when the Appellate Division held that the trial court "properly denied defendant's speedy trial motion," *Garland*, 155 A.D.3d at 527, 65 N.Y.S.3d at 169, it considered the issue solely in statutory terms under CPL § 30.30.

However, the picture is murkier at the New York Court of Appeals, where petitioner filed both a counseled letter-brief and a pro se supplement. His counseled letter-brief made no effort to raise a constitutional speedy trial claim. *See* Resp. App. at A-137 to A-158. But in his pro se supplement he cast his speedy trial claim in both statutory and constitutional terms, expressly invoking the Sixth Amendment. *See* Resp. App. at A-161, A-168. In its opinion, the Court of Appeals made no mention of either species of speedy trial claim, focusing solely on the "serious physical injury" point. It concluded, however, with this sentence: "We have considered defendant's remaining contentions and conclude that they are without merit." *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620. In respondent's view, this means that the Court of Appeals reviewed petitioner's pro se supplement "in full," and denied his constitutional speedy trial claim "on the merits," Resp. Mem. at 16-17, rendering them exhausted.

I concur. On an appeal from an order of the Appellate Division affirming a criminal conviction, the New York Court of Appeals "may consider and determine not only questions of law which were raised or considered upon the appeal to the intermediate appellate court, but also

---

[6] Petitioner's passing reference to "U.S. Const. Amend. XIV," *see* Resp. App. at A-037 to A-038, was insufficient to "present" the constitutional speedy trial claim to the Appellate Division. *See Gray*, 518 U.S. at 153 (a "general appeal to a constitutional guarantee as broad as due process" is insufficient); *Brown*, 2025 WL 1351613, at *10 (federal speedy trial claim was unexhausted where "the substance of Brown's argument in state court was directed to the right to a speedy trial provided by the applicable New York statute").

any question of law involving alleged error or defect in the criminal court proceedings resulting in the original criminal court judgment, sentence or order, regardless of whether such question was raised, considered or determined upon the appeal to the intermediate appellate court." CPL § 470.35(1). Moreover, while "[p]resenting a claim for the first time to a state court of discretionary review" is ordinarily "insufficient to exhaust the claim," that rule does not apply if the court, in its discretion, "considers [the claim]." *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000); *see also Marra v. Martuscello*, 2017 WL 9511095, at *6 (N.D.N.Y. May 25, 2017) (finding petitioner's ineffective assistance of counsel claim exhausted, even though he first presented it in constitutional terms to the Court of Appeals, "[b]ecause the Court of Appeals in this case 'actually passed upon' petitioner's ineffective assistance of counsel claim grounded in federal law"), *adopted,* 2017 WL 4012048 (N.D.N.Y. Sept. 12, 2017). Here, petitioner appealed by permission; presented the constitutional speedy trial issue to a court which had the authority to consider and determine "any question of law involving alleged error or defect in the criminal court proceedings," even if not raised below; and received a decision stating – albeit without further discussion – that the court "considered" all of petitioner's contentions and "conclude[d]" that they were "without merit." *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620. I therefore turn to the merits of petitioner's constitutional speedy trial claim, viewed through the deferential lens of 28 U.S.C. § 2254(d).

When determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, a federal district court considers four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "These factors 'must be considered together with such other circumstances as may be relevant,' and 'have no talismanic qualities.' Rather, they require courts to 'engage in a

24

difficult and sensitive balancing process.'" *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012) (quoting *Barker*, 407 U.S. at 530, 533).

Here, the period between arraignment and trial was approximately three years and ten months, which is substantial. Indeed, a wait of more than one year is generally enough "to make the threshold showing that a defendant was not tried with customary speed and thus to trigger a *Barker* inquiry in the first instance." *United States v. Moreno*, 789 F.3d 72, 83 n.10 (2d Cir. 2015). However, "[t]here is no bright-line rule for when a delay begins to infringe a defendant's speedy trial right," *United States v. Swinton*, 797 F. App'x 589, 594 (2d Cir. 2019), and "courts have often found no Sixth Amendment violation when trial was delayed by a considerably longer period" than the 46 months at issue here. *James v. Keyser*, 2023 WL 137618, at *4 (S.D.N.Y. Jan. 9, 2023); *see also*, *e.g.*, *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986) ("90-month delay"); *Barker*, 407 U.S. at 533 (a delay of "well over five years"); *United States v. Hoskins*, 44 F.4th 140, 154 (2d Cir. 2022) (a delay of "six years"); *United States v. Cabral*, 979 F.3d 150, 153 (2d Cir. 2020) (an "11-year delay"); *Swinton*, 797 F. App'x at 594 (a delay of "[a]lmost 57 months"). "Thus, the length of the delay between Petitioner's being charged and the commencement of his trial was insufficient on its own to establish a Sixth Amendment violation." *James*, 2023 WL 137618, at *4.

"[T]he second [*Barker*] factor – reason for delay – is often critical." *Moreno*, 789 F.3d at 79. That is because periods of pretrial delay must be located on a "spectrum of weights, in which . . . 'valid' reasons for delay . . . are taken off the scale entirely." *United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018); *see also Barker*, 407 U.S. at 531 ("[D]ifferent weights should be assigned to different reasons."). Consequently, "[t]he Sixth Amendment is rarely violated by delay attributable entirely to the defendant . . . or by delay that serves some legitimate government purpose." *Moreno*, 789 F.3d at 79 (citations omitted). Here, although three years had elapsed by

the time petitioner made his CPL § 30.30 motion, Justice Carter found – in a decision later upheld by the Appellate Division – that only 135 days of delay were "chargeable" to the People. Resp. App. at A-06. Other delays were attributable to the defendant himself or to "legitimate government purpose[s]," including an adjournment caused by the defendant's failure to appear due to being rearrested; adjournments caused by petitioner's change of counsel and by new counsel's request for time to familiarize himself with the case; and adjournments caused by the filing of the § 30.30 motion itself. *See id*. at A-05 to A-06.

"Although the state court's decision addressed state statutory speedy-trial rights, those findings, nevertheless, inform the federal constitutional issues weighed through the balancing test enunciated in *Barker*." *Wright v. Griffin*, 2017 WL 5514180, at *8 (E.D.N.Y. Nov. 16, 2017). Moreover, the state court's factual finding that only 135 days were "attributable to the state . . . is presumed to be correct because [petitioner] has not provided clear and convincing evidence rebutting this presumption." *Id.* Indeed, in his *habeas* papers, petitioner appears to rely almost entirely upon the *length* of time between arraignment and trial. *See*, *e.g*., 1/2/23 Ltr. at ECF p. 3 ("Unconstitutional case went to trial after **3 years and 10 months**."). He makes no effort to distinguish between conduct that "should be weighted heavily against the government," such as intentional delays, *Barker*, 407 U.S. at 531, and "valid" reasons for delay, such as "a missing witness." *Id*.[7]

The third *Barker* factor weighs in petitioner's favor. Since 2013 he has argued vigorously, albeit in statutory terms, that his speedy trial rights were violated.

---

[7] In this case, there is no evidence in the *habeas* record suggesting that the People intentionally delayed petitioner's trial. There is evidence that the People required at least one adjournment because "they had lost contact with their complainant." Resp. App. at A-05.

26

But the final factor – prejudice – does not help him. "Evaluations of prejudice due to delay must consider three interests protected by the right to a speedy trial: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *James*, 2023 WL 137618, at *5 (internal quotations and citation omitted). Here, petitioner appears to have been out on bail while awaiting trial (except, briefly, after he was rearrested). *See* Supp. Tr. at 67 (Justice Benitez, warning petitioner to "be here on time for every session," or risk forfeiting his bail). Therefore, he was not prejudiced by "oppressive pretrial incarceration." *James*, 2023 WL 137618, at *5. He does not claim to have suffered any particular anxiety or concern arising from the length of the pretrial period. And although he claims in conclusory terms that he was "prejudiced by delay," *see*, *e.g.*, 12/12/22 Pet. at ECF pp. 5, 8, he does not identify any litigation disadvantage (such as the unavailability of defense witnesses or the loss of exculpatory evidence) stemming from the time elapsed between arraignment and trial. As the Court noted in *Barker*, prejudice to the defendant is by no means a given where trial is delayed:

> As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

407 U.S. at 521. Here, the record suggests that the delay in bringing petitioner's case to trial was – if anything – helpful to him, because by the time of trial the People could not locate, and thus did not call, the eyewitness who initially identified petitioner as the shooter. *See* Supp. Tr. at 9-11,

27

210; Trial Tr. at 9. The 46-month gap also allowed petitioner's counsel to argue, with some force, that the People's witnesses did not have reliable memories of the events of October 2010.[8]

"Th[is] final factor – impairment to the defense – is the 'most serious' in the analysis of prejudice." *Richardson*, 2024 WL 763395, at \*24 (quoting *Barker*, 407 U.S. at 532). Thus, the Second Circuit has "generally required a showing of some significant trial-related disadvantage in order to establish a speedy-trial violation[.]" *Cain*, 671 F.3d at 297. Petitioner Garland has made no such showing. After weighing all of the *Barker* factors, therefore, I cannot find that petitioner's Sixth Amendment right to a speedy trial was violated. Consequently, I cannot conclude that the New York Court of Appeals, in rejecting his speedy trial claim, rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

### B.    Sufficiency of the Evidence

The Due Process Clause prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.*" In re Winship*, 397 U.S. 358, 364 (1970). Thus, a claim asserting that the evidence supporting a conviction "cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt" states "a federal constitutional claim," cognizable in a *habeas* proceeding. *Jackson v. Virginia*, 443 U.S. at 321 (internal citations omitted); *accord Einaugler v. Supreme Court of N.Y.*, 109 F.3d 836, 839 (2d Cir. 1997).

---

[8] For example, during defense counsel's summation he repeatedly impugned Detective O'Connell's credibility by pointing out his poor memory for those events. *See*, *e.g.*, Trial Tr. at 448 ("You saw Detective O'Connell on that witness stand, 'I don't know, I don't recall.' Come on, ladies and gentlemen, come on."); *id*. at 460 ("Simple follow-up question. Who notified you from patrol? I don't remember. I don't remember. You're the case detective, you're in charge. I don't know?").

In this Court, petitioner states, repeatedly: "No gun ever recovered." 12/12/22 Pet. at ECF pp. 5, 7, 8; 12/19/22 Pet. at ECF pp. 6, 9-10, 12; 1/2/23 Ltr. at ECF p. 3. Respondent construes this language, liberally, as asserting a claim that the evidence was legally insufficient to convict petitioner of criminally possessing a weapon. Resp. Mem. at 9. I construe the claim – even more liberally – as asserting that, without the gun, the evidence was insufficient to convict petitioner of either the weapon charge or the two assault charges, both of which required proof that it was petitioner who discharged a firearm into the crowd on Van Nest Avenue.

According to respondent, this claim is exhausted (as least as to the weapon charge), because petitioner made a *weight*-of-evidence claim as to that charge in the Appellate Division, *see* Resp. App. at A-020, A-050 to A-058,[9] which the court treated as a *sufficiency*-of-the-evidence claim when it ruled, in broad terms, that petitioner's "written confession also establishes the element of possession of a loaded firearm required for the weapon possession conviction." *Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170. Respondent adds that the New York Court of Appeals must also have "viewed petitioner's weapon possession claim as challenging the legal sufficiency" of the evidence, because that court "cannot review the merits of a weight of the evidence claim, since it presents only a factual issue," Resp. Mem. at 10 (citing *People v. Bleakley*, 69 N.Y.2d 490, 493, 515 N.Y.S.2d 761, 762 (1987)), and yet it held that all of petitioner's "remaining contentions" were meritless. Resp. Mem. at 10 (quoting *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620).

In my view, respondent assumes too much. Since petitioner did not raise a sufficiency-of-the-evidence claim to either the Appellate Division or the Court of Appeals – except

---

[9] A weight-of-the evidence claim, which arises under CPL §470.15(5), does not implicate the Due Process Clause or any other provision of federal law. Instead, it "states a claim under state law, which is not cognizable on habeas corpus." *McKinnon v. Superintendent*, 422 F. App'x 69, 75 (2d Cir. 2011).

as to whether Bethea suffered a "serious physical injury," which is not at issue in this Court – neither state court opinion can be fairly read as rejecting, on the merits, the claim that the evidence was insufficient to convict him because the gun was never recovered. I therefore view petitioner's current claim as procedurally defaulted, since he has already enjoyed "one complete round of the State's appellate review process," *O'Sullivan*, 526 U.S. at 845, during which he failed to raise the claim, and "New York's procedural rules prevent him from raising this claim in a successive direct appeal in New York state court." *Zamani v. Att'y Gen.*, 2018 WL 6303820, at *9 (E.D.N.Y. Nov. 30, 2018); *see also Sanabria v. Martuscello*, 2019 WL 4942118, at *12 (S.D.N.Y. Oct. 8, 2019) ("New York law does not allow for successive direct appeals leaving Petitioner with no ability to return to state court to exhaust the claim."). Moreover, petitioner has not shown cause for his state court default and resulting prejudice, nor that a fundamental miscarriage of justice would occur if the merits of the federal claim were not considered. *Coleman*, 501 U.S. at 750; *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (a prisoner seeking habeas relief must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider that claim's merits," unless he can "demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice").

I agree with respondent, however, that *if* petitioner's sufficiency-of-the-evidence claim was exhausted and rejected on the merits by the state courts, it must also be denied on the merits by this Court. When a state court has passed on such a claim, the federal *habeas* court reviews that decision through a "doubly deferential" lens. *Garbutt v. Conway*, 668 F.3d 79, 81-82 (2d Cir. 2012). As the Supreme Court explained:

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on

> direct appeal, . . . [a] reviewing court may set aside the jury's verdict on the ground
> of insufficient evidence only if no rational trier of fact could have agreed with the
> jury. And second, on habeas review, "a federal court may not overturn a state court
> decision rejecting a sufficiency of the evidence challenge simply because the
> federal court disagrees with the state court." The federal court instead may do so
> only if the state court decision was "objectively unreasonable."

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)

(per curiam)).

Here, there was ample evidence from which a rational jury could conclude that petitioner

possessed a loaded, operable firearm – and used it to shoot Bethea in the leg on October 9, 2010

– despite the fact that the gun itself was never recovered. The video evidence showed a single

individual firing a gun into a crowd of people on Van Nest Avenue. Although the video did not

provide "a clear image of the face" or show "what the person looked like," Trial Tr. at 187, 501,

when petitioner was arrested two days later (having had plenty of time to dispose of the weapon),

he hand-wrote and signed two statements, both of which acknowledged that he was at the scene

and discharged the firearm. In his first statement, he wrote that he grabbed a gun from a stranger

and shot it in the air. *Id*. at 150. In the addendum, he repeated that he "grabbed the gun," and

claimed that he discharged it "to back everyone away from us." *Id*. at 152. He also wrote that he

shot the gun "about five times," *id*., which is consistent with the ballistics evidence recovered from

the scene. *See id*. at 353-55 (Detective Bahm, testifying that five .32 caliber shell casings were

recovered from the scene, all from the same weapon). The next day, while in court listening to a

prosecutor accuse him of discharging five shots towards at least 20 people, petitioner called out

– unprompted – "in the air. I wasn't . . . ," *id*. at 313-14, thus once again attempting to minimize

his culpability while at the same time acknowledging that he was the gunman seen in the video.

There is, of course, no rule requiring the People to produce the actual weapon possessed

by a defendant in order to prove that he possessed (or discharged) it. *See*, *e.g.*, *Davidson v.*

31

*Cunningham*, 2017 WL 3738560, at \*24 (E.D.N.Y. Aug. 29, 2017) ("[P]etitioner's claim that the state would be unable to prove the weapon possession charge because no weapon was recovered is meritless."); *Lewis v. Lee*, 2015 WL 5751396, at \*11 (S.D.N.Y. Sept. 29, 2015) ("[T]he eyewitnesses' testimony along with the ballistics evidence and Petitioner's own inculpatory statements provide proof beyond a reasonable doubt that Petitioner possessed a loaded firearm[.]"); *Fabre v. Taylor*, 2009 WL 162881, at \*11 (S.D.N.Y. Jan. 20, 2009) ("[The petitioner] was charged with committing second degree weapon possession on May 22, 2005, not on the date of his arrest. Thus, the State's failure to recover a weapon from [the petitioner's] person or home would not have impacted whether the State could have proven its case beyond a reasonable doubt."), *adopted*, 2009 WL 1457169 (S.D.N.Y. May 26, 2009). Here, as in *Lewis*, the eyewitness testimony (from Bethea), the ballistics evidence, "and Petitioner's own inculpatory statements," 2015 WL 5751396, at \*11, provided sufficient evidence from which a rational trier of fact could have found him guilty of the assault in the first degree and criminal possession of a weapon in the second degree. I therefore conclude that the state court was not "objectively unreasonable," *Johnson*, 566 U.S. at 651, in declining to set aside the jury's verdict on the ground that "no gun [was] ever recovered."

### C.   Warrantless Entry

In his Amended Petition, Garland complains of a "warrantless warrant," 12/12/22 Pet. at ECF pp. 5, 8; 12/19/22 Pet. at ECF pp. 7, 10, 12. I construe this claim – as does respondent – as brought under *Payton v. New York*, which held that "the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576 (citations omitted).

After the pretrial suppression hearing – during which both Detective Brown and petitioner testified about petitioner's arrest – Justice Benitez found that the NYPD did have consent to enter

32

the apartment, granted by Deborah Toney, who "had the authority to admit or deny admission to any person seeking entry," and who "voluntarily admitted them into the apartment." Supp. Tr. at 214. At the hearing, petitioner agreed that Ms. Toney was "[t]he owner of the house," *id*. at 181, and admitted that he did not hear what the NYPD said to her after she went to the door and asked who it was. *Id*. at 106.[10] In this Court, however, he argues that "[t]he warrant Squad falsely announced they had a warrant for Ricky [Jackson, another occupant of the home], which is the head of household, for child support, they were not invited in." 1/2/23 Ltr. at ECF p. 3.

Petitioner's Fourth Amendment claim was raised to both the Appellate Division, which rejected it in a reasoned decision, and the Court of Appeals, which rejected it again. Even though the claim is exhausted, however, it is well-settled that a state prisoner is not entitled to *habeas* relief on Fourth Amendment grounds "where the State has provided an opportunity for full and fair litigation" of his Fourth Amendment claims. *Stone v. Powell*, 428 U.S. 465, 494 (1976); *accord Graham v. Costello*, 299 F.3d 129, 133-34 (2d Cir. 2002) ("Fourth Amendment claims are not reviewable by the federal courts when raised in a petition brought under § 2254 unless the state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court."). Thus, federal courts sitting in *habeas* may review Fourth Amendment claims only in "one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *accord Fawzi v. Kopp*, 2024 WL 5224704, at *5 (S.D.N.Y. Dec. 24, 2024); *Carrasco v. Miller*, 2021 WL 1040473, at *2 (S.D.N.Y. Mar. 18, 2021). Conversely, "once it is established that a petitioner has had an

---

[10] Ms. Toney did not testify.

33

opportunity to litigate his or her Fourth Amendment claim . . . the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." *Graham*, 299 F.3d at 134.

It is equally well-settled that "New York's procedure for litigating Fourth Amendment claims," which was followed here, is "facially adequate." *Capellan*, 975 F.2d at 70 n.1; *accord Fawzi*, 2024 WL 5224704, at *5. Thus, the only remaining question is whether petitioner was "precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70. "[T]he focus of the inquiry as to whether there has been an 'unconscionable breakdown' in the state corrective process is on 'the existence and application of the corrective procedures themselves' rather than on the 'outcome resulting from the application of adequate state court corrective procedures.'" *Singh v. Miller*, 104 F. App'x 770, 772 (2d Cir. 2004) (quoting *Capellan*, 975 F.2d at 71); *see also*, *e.g.*, *Fawzi*, 2024 WL 5224704, at *6 (petitioner's failure to call his mother at the suppression hearing, to testify about whether she gave the police consent to enter his room to arrest him, was "not a breakdown in or disruption of the existence or application of the state's procedure," and therefore did not entitle him to federal *habeas* review of his Fourth Amendment claim).

Petitioner Garland has never alleged any breakdown in the process afforded to him by the state courts. In his direct appeal, he argued only that Detective Brown's testimony was "not credible," and thus that "the People failed to satisfy their burden of proving the legality of the arrest." Resp. App. at A-076. But "[p]etitioner's assessment of Det. [Brown's] credibility does not displace the trial court's." *Richardson v. Capra*, 2023 WL 2601895, at *10 (S.D.N.Y. Mar. 22, 2023), *aff'd,* 2024 WL 2130747 (2d Cir. May 13, 2024), and *aff'd,* 2024 WL 2161008 (2d Cir. May 14, 2024). Moreover, as noted above, in this Court petitioner rests his Fourth Amendment

34

argument on facts unsupported even by his own testimony at the suppression hearing. Accordingly, under the rule announced in *Stone v. Powell*, petitioner's Fourth Amendment claim does not provide "a valid basis for *habeas* relief." *Fawzi*, 2024 WL 5224704, at *6.

### D.    Miranda Violation

Petitioner next claims a "Miranda . . . violation." 12/12/22 Pet. at ECF pp. 5, 7-8; 12/19/22 Pet. at ECF pp. 7, 10, 12; *see also* 1/2/23 Ltr. at ECF p. 3 (alleging that he was "arrested at 6 a.m." but "Mirandized at 12 noon"); *id*. at ECF p. 4 (alleging that Detective O'Connell "instructed me as to what he wanted written").[11] Respondent construes this claim as alleging that petitioner's post-arrest statements were admitted in violation of the Fifth Amendment, as made applicable to the States by the Fourteenth Amendment, because they were not voluntarily made, and characterizes the claim as "exhausted" but "meritless." Resp. Mem. at 21. I agree.

The New York Appellate Division reviewed petitioner's Fifth Amendment claim on the merits, and held that the trial court properly denied petitioner's motion to suppress his statements because at the pretrial suppression hearing the People "met their burden of demonstrating that defendant waived his *Miranda* rights and made the written statement[s] voluntarily." *Garland*, 155 A.D.3d at 528, 65 N.Y.S.3d at 169. That decision is entitled to AEDPA deference, *see* 28 U.S.C. § 2254(d)(1)-(2), meaning that this Court may not grant *habeas* relief unless it determines that the Appellate Division was "unreasonable" in so holding. *Berghuis v. Thompkins*, 560 U.S. 370, 378, 380 (2010) (holding that Thompkins was not entitled to *habeas* relief because, *inter alia*, the Michigan Court of Appeals' decision rejecting his *Miranda* claim on the merits was not unreasonable).

---

[11] Petitioner's timeline is consistent with the testimony of Detective O'Connell, who stated that he advised Garland of his Miranda rights "around noon," *before* asking petitioner about the shooting. Supp. Tr. at 21, 59.

When determining whether an inculpatory statement made during a custodial interrogation is admissible in evidence, courts ask whether the prosecution has established that the statement was "the product of an essentially free and unconstrained choice by its maker," in which case it is admissible, or whether the arrestee's "will has been overborne and his capacity for self-determination critically impaired," in which case "the use of his confession offends due process." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). To make that determination, the court must assess "the totality of all the surrounding circumstances," *id*. at 226, giving "great deference to the factual findings of the state court." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *see also* 28 U.S.C. § 2254(e)(1) (in *habeas* proceedings under § 2254, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner based on "clear and convincing evidence"). In cases challenging the voluntariness of a confession, therefore, state court findings that resolve the "conflicting testimony of police and defendant" concerning factual matters such as "the length and circumstances of the interrogation" are "conclusive on the habeas court if fairly supported in the record[.]" *Miller v. Fenton*, 474 U.S. 104, 117 (1985); *accord Thompson v. Keohane*, 516 U.S. 99, 111 (1995) ("'[W]hat happened' determinations . . . warrant a presumption of correctness[.]").[12] However, "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller*, 474 U.S. at 110, 112.

---

[12] *See*, *e.g.*, *Gordon v. Mantello*, 155 F. App'x 562, 564 (2d Cir. 2005) (summary order) (presuming correctness of state court factual determinations underlying denial of suppression motion, including that "Gordon was not handcuffed to the bed at the time" of the questioning and that later, after he was handcuffed, the police "did not ask Gordon any questions"); *Walker v. James*, 116 F. App'x 295, 297 (2d Cir. 2004) (summary order) (presuming correctness of state court's factual findings that James "understood the *Miranda* warnings provided to him by the assistant district attorney, that he seemed relaxed, alert, cooperative, and forthcoming during the videotaped questioning, and that he was familiar with police custody given his previous arrests").

Applying these standards, I conclude that "[t]he Appellate Division's decision, which agreed with the hearing court, was neither 'contrary to' nor an 'unreasonable application of' Supreme Court case law." *James*, 116 F. App'x at 297.

Justice Benitez, who heard the evidence presented at the suppression hearing, properly resolved the "conflicting testimony of police and defendant," *Miller*, 474 U.S. at 117, finding Detective O'Connell credible and petitioner "quite incredible." Supp. Tr. at 208, 212. Justice Benitez then made a number of "what happened" factual determinations, *Thompson*, 516 U.S. at 111, including that petitioner "was not intoxicated or ill" to the extent that his "physical condition would undermine his ability to make a decision as to whether or not to make a statement," Supp. Tr. at 215; that the police "did not perceive any type of illness or intoxication on [his] part," *id*.; that Detective O'Connell "did not mislead him as to the reason for his presence in police custody," *id*. at 216; that "prior to any custodial interrogation, . . . at approximately 12 noon on October 11th, . . . Detective O'Connell properly advised him of his *Miranda* rights," *id*.; and that "at no time before or during his interrogation did the defendant decline to answer questions or did the defendant ever request that counsel be obtained for him or he be permitted to call an attorney." *Id*.

These findings are entitled to "great deference," *Fulminante*, 499 U.S. at 287, and must be presumed correct unless they are rebutted by "clear and convincing" evidence. 28 U.S.C. § 2254(e)(1). Petitioner Garland points to no such evidence, relying instead on his own contrary testimony, which the suppression court found incredible. Consequently, Justice Benitez's factual findings, which are "fairly supported" by the record, are "conclusive on the habeas court," *Miller*, 474 U.S. at 117, and are more than adequate for this Court to determine that petitioner's post-arrest statements were voluntarily made, after he was properly advised of his *Miranda* rights, and were therefore admissible as evidence against him. The fact that substantial portions of petitioner's

statements were exculpatory "further underscores the voluntariness of the statement[s] he made after being read *Miranda* warnings." *Richardson*, 2023 WL 2601895, at *13. I therefore conclude that the decision of the Appellate Division, determining that petitioner "waived his *Miranda* rights and made the written statement[s] voluntarily," *Garland*, 155 A.D.3d at 528, 65 N.Y.S.3d at 169, "was neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor was it 'based on an unreasonable determination of the facts.'" *James*, 116 F. App'x at 298 (quoting 28 U.S.C. § 2254(d)).

### E.   Brady Violations

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. at 87. Petitioner Garland claims, in this Court, that he is entitled to the writ because of a "Brady violation." 12/12/22 Pet. at ECF pp. 5, 7, 8; 12/19/22 Pet. at ECF pp. 7, 12; *see also* 1/2/23 Ltr. at ECF p. 2 (alleging that the prosecutor "withheld evidence of police misconduct from Jurors," failed to "disclose" that "**no gun [was] ever recovered**"); *id*. at ECF p. 3 (alleging that the surveillance video played at trial was "tampered with" to "fraudulently frame defendant"). I construe these allegations – liberally – as a claim that the prosecutor violated *Brady* by suppressing evidence of police misconduct during his arrest and interrogation; evidence that no gun was ever recovered; and evidence that the surveillance video was tampered with. As so construed, the claim is exhausted – having been presented to and rejected by the Court of Appeals along with all of petitioner's "remaining contentions," *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620 – but meritless.

Petitioner appears to misunderstand what rights *Brady* protects. It does not govern what evidence is admitted at trial or how that evidence is presented to the jury. *See Alba v. City of New York*, 2025 WL 2420969, at *26 (S.D.N.Y. July 18, 2025) ("plaintiff's *Brady* claim failed because,

38

while he alleged that [the prosecutor and the NYPD] *mischaracterized* the contents of the Store Videos, he did not allege that they *withheld* the footage"), *adopted,* 2025 WL 2419573 (S.D.N.Y. Aug. 21, 2025). Rather, *Brady* requires the prosecutor to disclose material, exculpatory evidence to the defendant, "in time for its effective use at trial or at a plea proceeding." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Thus, to prevail on a *Brady* claim, a petitioner must (i) identify material evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching," (ii) show that it was "suppressed by the State, either willfully or inadvertently," and (iii) demonstrate that prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)); *see also Martin*, 2026 WL 189976, at *4 (evidence that could "not have reasonably had such an effect" is not "material, and its erroneous nondisclosure does not justify relief"). Where, as here, the *Brady* claim is raised in a federal *habeas* proceeding after being rejected on the merits by a state appellate court, the petitioner must also show that the state court decision was "contrary to" or involved an "unreasonable application" of "clearly established Federal law." *Martin*, 2026 WL 189976, at *1; 28 U.S.C. § 2254(d)(1).

Here, petitioner fails the first prong of the *Strickler* test, in that he does not identify any exculpatory evidence that was withheld from him. Petitioner was present when the NYPD arrested and interrogated him. During the suppression hearing, he testified at length about the officers' alleged misconduct during those events. He therefore cannot claim that evidence of that misconduct was withheld from him. Likewise, the fact that no gun was ever recovered was well known to him – and, of course, to the jury. *See*, *e.g.*, Trial Tr. at 488 (ADA Schordine, in

39

summation, acknowledging, "I can't show you the gun that the defendant used to shoot Lloyd Bethea.").

Petitioner's allegation that the surveillance video was tampered with ("to conceal riot and fraudulently frame defendant," 1/2/23 Ltr. at ECF p. 3) could, in theory, be the basis of a *Brady* claim (if the People had evidence of the tampering and withheld that evidence from the defense), but petitioner offers nothing but his own speculation that any tampering occurred. Not surprisingly, therefore, he fails to identify the evidence that – had it been turned over – would have assisted him in exposing it. This is plainly insufficient. *See Chrysler v. Guiney*, 14 F. Supp. 3d 418, 450 (S.D.N.Y. 2014) ("[A]s a general matter, *Brady* claims fail where the claimant fails specifically to identify the 'potential undisclosed *Brady* materials' or 'to set forth any specific facts indicating that such evidence was withheld. Conclusory or speculative allegations that the Government failed to disclose evidence are insufficient to support a *Brady* violation.'") (quoting *Verdel v. Cunningham,* 2008 WL 2755833, at *4 (S.D.N.Y. July 14, 2008)); *Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. May 26, 2006) ("the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief") (citing *Strickler*, 527 U.S. at 286); *Cruz v. Artuz*, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002) (dismissing petitioner's *Brady* claim as "patently frivolous" because it was "speculative, conclusory and unsupported") (quoting *Franza v. Stinson*, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999)); *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. May 20, 1998) ("Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief.")

Petitioner's *Brady* claim fails the second and third *Strickler* prongs as well. Since he does not identify any exculpatory evidence in the People's hands, he cannot establish that any such evidence was "suppressed," either willfully or inadvertently, nor that its absence prejudiced his

40

trial. *See Stevenson v. Capra*, 2018 WL 582467, at *2 (E.D.N.Y. Jan. 26, 2018) (petitioner's bare assertions that alleged *Brady* materials could have helped in his defense "falls short of suggesting a 'reasonable probability' of a different result at trial"). Finally, because petitioner has failed to allege a viable *Brady* claim, he has also failed to show that the state court "blundered so badly," in rejecting that claim, "that every fairminded jurist would disagree with the decision." *Martin*, 2026 WL 189976, at *4 (cleaned up).

### F.      Confrontation Clause

In this Court, petitioner argues that his Sixth Amendment right to confront the witnesses against him was violated because, although the People "did not have an eyewitness for trial," Detective O'Connell was permitted to offer "HEARSAY TESTIMONY" supplied by the eyewitness who identified him as the shooter. 1/2/23 Ltr. at ECF p. 4. Respondent argues that this claim is procedurally barred, because it was never presented in constitutional terms to the state courts, *see* Resp. Mem. at 56-58, and in any event is meritless because no "testimonial statements" of the eyewitness were admitted at trial. *Id*. at 59-60. Respondent is correct.

In his supplemental pro se brief to the New York Court of Appeals, petitioner claimed that he was prejudiced by hearsay testimony from Detective O'Connell, *see* Resp. App. at A-170, but did not invoke the Sixth Amendment, cite any federal cases, or otherwise "alert[] that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29. He therefore failed to exhaust his Confrontation Clause claim in state court. *See Williams v. Lee*, 2019 WL 935958, at *3 (S.D.N.Y. Feb. 26, 2019) (petitioner's state-court argument "that the testimony was inadmissible hearsay" was "insufficient to provide state courts with the required notice of a due process claim") (collecting cases). And since "New York law does not allow for successive direct appeals,"

*Sanabria*, 2019 WL 4942118, at *12, that claim is now procedurally defaulted.[13] Moreover, petitioner has made no effort to show cause for his state court default and actual prejudice from the alleged violation of federal law, or that a fundamental miscarriage of justice would occur if the merits of the federal claim were not considered, as required by *Coleman*. 501 U.S. at 750.

In any event, no Confrontation Clause violation occurred.

The Sixth Amendment guarantees the right of a criminal defendant to "be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court instructed that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial," unless that witness was unavailable to testify and the defendant had a prior opportunity to cross-examine him. *Id*. at 53-54. "A statement qualifies as testimonial if the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony,'" *Ohio v. Clark*, 576 U.S. 237, 237 (2015) (alteration in original) (quoting *Michigan v. Bryant,* 562 U.S. 344, 369 (2011)), and if the out-of-court statement is offered at trial "to establish the truth of the matter asserted." *Ganthier v. Supt., Green Haven Corr. Facility*, 2025 WL 2452386, at *14 (E.D.N.Y. Aug. 26, 2025). By contrast, "[o]ut-of-court statements not offered for the truth of the matter asserted may be admissible as background evidence to 'furnish an explanation of the understanding or intent with which certain acts were performed.'" *United States v. Roy*, 444 F. App'x 480, 482 (2d Cir. 2011) (summary order) (quoting *United States v. Reifler*, 446 F.3d 65, 92 (2d Cir. 2006)). Thus, "the Confrontation Clause is not violated by testimony describing investigative steps when such testimony is reasonably necessary to explain

---

[13] Petitioner raised the same hearsay claim, in the same non-constitutional terms, in his pro se CPL § 440.10 motion. *See* Resp. App. at A-220. Even if he had used constitutional language in that motion, however, it would not cure his prior failure to exhaust the claim, because the New York courts are required to deny record-based § 440.10 claims that could and should have been raised on direct appeal. *See* CPL § 440.10(2)(c).

the actions of law enforcement and the probative value of the testimony does not outweigh its prejudicial effect." *Burgess v. Sheahan*, 2017 WL 9325814, at *11 (S.D.N.Y. Sept. 8, 2017), *adopted,* 2018 WL 2186409 (S.D.N.Y. May 11, 2018).

"[T]he right to confrontation attaches at trial, but not to pretrial suppression proceedings." *United States v. Shaw*, 2017 WL 1380598, at *6 (S.D.N.Y. Apr. 13, 2017) (Sullivan, J.); *accord Martinez v. Griffin*, 2019 WL 4168535, at *2 (E.D.N.Y. Sept. 3, 2019). Consequently, petitioner's Confrontation Clause claim must arise – if at all – from Detective O'Connell's trial testimony.

At trial, Detective O'Connell testified that after he spoke with Bethea at the hospital, he "did a canvass for witnesses" and recovered the surveillance video. Trial Tr. at 129. The testimony continued:

> Q. After recovering that video surveillance and canvassing, as you said – by the way, what do you mean by canvassing?
>
> A. Basically knocking on doors looking for witnesses to the incident.
>
> Q. After you concluded, as I said, obtaining the video and canvassing for witnesses, did you settle upon the name of a suspect?
>
> A. Yes.
>
> Q. What was that suspect's name?
>
> A. Tamarkqua Garland.
>
> * * *
>
> Q. After you settled upon the defendant as the suspect in the case, what did you do, what if any police actions did you take?
>
> A. I issued what was called a want card for the suspect.

*Id*. at 129-130. Petitioner's counsel did not object to these questions.

The jury may have been able to infer, from this testimony, that O'Connell got petitioner's name from a witness. But he never repeated any out-of-court statements made by the witness, much less offered them for the truth of the matter asserted. Thus, his testimony did not violate New

43

York's hearsay rule,[14] much less the Confrontation Clause. Moreover, the purpose of the brief and non-specific testimony offered by Detective O'Connell about his witness canvass was simply to explain how he came to issue a "want card" for petitioner; that is, to provide "background information," *Roy*, 444 F. App'x at 482, about his "investigative steps," where "such testimony [was] reasonably necessary to explain the actions of law enforcement." *Burgess*, 2017 WL 9325814, at *11; *see also Washington v. Noeth*, 2021 WL 3173273, at *4 (E.D.N.Y. July 27, 2021) (no Confrontation Clause violation where "[a]ll that the testimony did was alert the jury that Detective Bodnar had not pulled petitioner's name out of a hat; it did not disclose the myriad of possible investigative sources or the substance of what they told him that led to his decision to look for petitioner"). Consequently, even if petitioner had fully exhausted his Confrontation Clause claim, he would be entitled to no relief in this Court.

### G.     Prosecutorial Misconduct

Petitioner next claims that there was "felonious misconduct" by the prosecutor, ADA Schordine, who made "[d]isparagement [*sic*] comments" during the trial, improperly introduced "the 'fruit from the poisonous tree,' as his opening and closing argument," and "withheld" and "[m]ischaracterized" evidence. 1/2/23 Ltr. at ECF p. 2. To the extent petitioner's complaint is that his confession should not have been admitted as evidence, because it was the "fruit" of the NYPD's allegedly unlawful entry into Ms. Toney's apartment to arrest him, that claim is discussed in Part III(C), above. To the extent petitioner's grievance is that the ADA withheld exculpatory evidence, that claim is discussed in Part III(E) above. Respondent construes the remainder of petitioner's

---

[14] In New York, "[t]he hearsay rule interdicts the introduction of an out-of-court statement offered to establish the truth of its assertion[.]" *People v. Salko*, 47 N.Y.2d 230, 239, 417 N.Y.S.2d 894, 899, *reargument denied, remittitur amended sub nom. People v. Salko*, 47 N.Y.2d 1010, 420 N.Y.S.2d 223 (1979).

prosecutorial misconduct claim as alleging that the ADA made "prejudicial remarks during summation," Resp. Mem. at 29, "assumes that the claim was denied on the merits," *id*., and argues – at length – that no constitutional error was committed. *Id*. at 30-54.

I agree that petitioner's prosecutorial misconduct allegations are best construed as a claim that the People's summation "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)), in violation of the Fourteenth Amendment. This is the argument that he made, through counsel, to the Appellate Division. *See* Resp. App. at A-058 to A-068 (arguing that the ADA "acted as an unsworn witness" to bolster Bethea's credibility, "appealed to the jurors' sympathies and emotions," "inject[ed] his personal views about [Garland's] guilt," "shifted the burden of proof, mocked the defense, and misrepresented key medical evidence," and that "the cumulative impact of so many remarks was to deprive appellant of his right to a fair trial"). However, the Appellate Division rejected those claims as unpreserved, and declined to review them "in the interest of justice," before holding, alternatively, that there was no constitutional violation:

> By failing to object to any of the alleged prejudicial comments by the prosecutor, [petitioner] failed to preserve his challenges to the People's summation, and we decline to review them in the interest of justice. As an alternative holding, we find no basis for reversal. The bulk of the challenged remarks were either fair response to defense counsel's arguments on summation or fair comment on the evidence, and any improprieties were not so egregious as to deprive defendant of a fair trial.

*Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170.

The Appellate Division's determination that petitioner failed to preserve his arguments concerning the ADA's "prejudicial comments" constitutes an independent and adequate state ground, rooted in the "firmly established and regularly followed" New York requirement, grounded in CPL § 470.05(2), that a challenge to the People's summation must be preserved by

"contemporaneous objection" in order to secure appellate review. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule.") (collecting cases). Moreover, petitioner has failed, once again, to demonstrate either cause and prejudice or that a fundamental miscarriage of justice would occur if the merits of his summation-related claims were not considered, as required by *Coleman v. Thompson*, 501 U.S. at 750. The claim is therefore procedurally barred. *See Joseph v. Conway*, 671 F. Supp. 3d 248, 257 (E.D.N.Y. 2023) (Chin, J.) ("Because the Appellate Division rejected [petitioner's claim of prosecutorial misconduct during summation] on the ground that it was 'largely unpreserved for appellate review,' this determination constitutes an independent and adequate state ground that precludes habeas review of this claim in federal court.") (internal citations omitted); *accord Fawzi v. Kopp*, 2024 WL 5227326, at *15 (S.D.N.Y. July 15, 2024), *adopted,* 2024 WL 5224704 (S.D.N.Y. Dec. 24, 2024); *Tavarez v. Graham*, 2023 WL 3628412, at *2 (E.D.N.Y. May 24, 2023); *Murray v. Greene*, 2006 WL 3751294, at *14-17 (S.D.N.Y. Dec. 21, 2006); *Roberts v. Batista*, 2003 WL 1900866, at *7 (S.D.N.Y. Apr. 16, 2003).[15]

---

[15] It is true, as respondent points out, that in his counseled brief to the New York Court of Appeals, "petitioner stated in a footnote that he sought to raise all the issues from his Appellate Division brief." Resp. Mem. at 29 (citing Resp. App. at A-137). It is also true, as noted above, that the Court of Appeals – after discussing the "serious physical injury" point in detail – concluded in a single sentence that all of petitioner's "remaining contentions" were "without merit." *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620. Respondent reads that sentence as signifying that the Court of Appeals "reviewed the claim [of prosecutorial misconduct during summation] in full" and denied it "on the merits," thereby rendering the claim reviewable in this Court under AEDPA. Resp. Mem. at 29-30. I disagree. The Court of Appeals fully "affirmed" the decision of the Appellate Division, *Garland*, 32 N.Y.3d at 1095, 90 N.Y.S.3d at 619, which means – in the absence of any contrary indication by that court – that it affirmed the Appellate Division's primary holding that the claim of prosecutorial misconduct during summation was "unpreserved," as well as its alternative holding that the claim lacked merit. Thus, the claim remains procedurally barred. *See Harris,* 489 U.S. at 264 n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the

In any event, the Appellate Division's alternative holding, finding "no basis for reversal" due to the prosecutor's summation, *Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170, is neither contrary to "clearly established Federal law" nor "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For constitutional purposes, only "egregious misconduct" that "amount[s] to a denial of constitutional due process" warrants relief. *Donnelly*, 416 U.S. at 647-48 (habeas relief was correctly denied, even though prosecutor made improper remarks, because "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice'") (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden* , 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The Second Circuit applies a three-factor test: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Floyd v. Meacham*, 907 F.2d 347, 355 (2d Cir. 1990) (citation omitted).

Analyzing these factors, I conclude – as did the Appellate Division – that "[t]he bulk of the challenged remarks were either fair response to defense counsel's arguments on summation or fair comment on the evidence[.]" *Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170. Under federal law, "[b]oth prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments." *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978); *see also Darden*, 477 U.S. at 182 (noting that where the defense summation invites a particular

federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

47

response from the prosecution, such a response is less likely to jeopardize the trial's fairness). Here, virtually all of the "challenged remarks" by the prosecutor were made in direct response to arguments raised by defense counsel, or properly asked the jury to draw permissible inferences from the record.

For example, defense counsel made much of the fact that the People had agreed to assist the victim, Lloyd Bethea, in moving out of the neighborhood where the shooting occurred. During his own summation, attorney London used this information to argue that the government "paid for" Bethea's testimony, Trial Tr. at 451, adding that Bethea:

> . . . doesn't fear my client, doesn't fear anybody in this case, he just wants out of that neighborhood. He's willing to do anything to just get out of that neighborhood, including singing the song that the government wants you to hear.

*Id.* at 459. In response, the prosecutor reminded jurors that because Bethea testified at trial, petitioner had "all of Lloyd's information," such as his name and address, and urged jurors to:

> . . . put yourself in Lloyd's position. Would you want to move? Once that information is out in the open, would you want to stay in that same apartment? Or would you want to stay there after you just testified against someone who is shooting the gun at you? I submit, jurors, that you would want to move.

*Id.* at 503.

It is true, as petitioner argued to the Appellate Division, that there was no direct evidence before the jury of "any threats to the witness." Resp. App. at A-060. Nonetheless, in this instance the prosecutor's argument concerning the motivations of a key witness was clearly "invited by" and "responsive to" defense counsel's earlier argument – similarly ungrounded in any direct evidence – as to the motivations of the same witness. *Darden*, 477 U.S. at 182; *see also Gomez v. Griffin*, 2021 WL 1224885, at *17 (E.D.N.Y. Mar. 31, 2021) ("Defense counsel argued to the jury that Witness #4, Witness #6, and Witness #5 were not actually in fear for their lives when they testified against Gomez. Thus, it was permissible for the prosecutor to rebut that argument and

48

reiterate the potential consequences the witnesses faced by cooperating with law enforcement."). Moreover, by using the phrase "I submit," the ADA signaled – appropriately – that he was merely suggesting an inference that was for the jury to make. *See United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) (finding no improper vouching of credibility when the prosecutor began the sentence with "I submit"); *Clemmons v. Lee*, 2021 WL 6750664, at *19 (S.D.N.Y. Oct. 28, 2021) (same), *adopted,* 2022 WL 255737 (S.D.N.Y. Jan. 27, 2022).

As another example, petitioner argued to the state courts that the ADA improperly "vouch[ed] for the strength of the prosecutor's case," and "inject[ed] his personal views about [petitioner's] guilt," *see* Resp. App. at A-063, by referring to the People's case as "easy," *see* Trial Tr. 513, and by telling the jurors that "you know" or "we all know" various facts:

> You know the gun is loaded because you see him shooting in the video. You know the gun worked because the detective said that he found these – that the shell casings were found on the ground and they all came from the same gun. You know that the gun worked because it left a bullet in Lloyd's leg.
>
> For that charge [criminal possession of a weapon] no injury is required. And we all know all of those facts I've just said for the past five or ten minutes. We all know every one of those beyond a reasonable doubt. You see the gun, you know it was loaded, as I said. And you know who was the one who was shooting, because he told essentially everyone that would listen, to the detective in written statements, to the Judge.

Trial Tr. at 511.

It is not improper, of course, for a prosecutor to "argue a criminal defendant's guilt." *Totesau v. Lee*, 2022 WL 1666895, at *25 (E.D.N.Y. May 25, 2022), *aff'd,* 2023 WL 8253683 (2d Cir. Nov. 29, 2023). While prosecutors may not express their personal belief in the guilt or innocence of a criminal defendant, *see Bellamy v. City of New York*, 914 F.3d 727, 763 (2d Cir. 2019) (noting that it was inappropriate for prosecutors to tell the jury, "I know who committed the murder"), they are entitled to "'broad latitude' . . . in suggesting inferences from the evidence in closing." *United States v. Londono-Tabarez*, 121 F. App'x 882, 885 (2d Cir. 2005) (summary

order) (quoting *United States v. Myerson*, 18 F.3d 153, 163 (2d Cir. 1994)). Here, as in *Totesau*, the prosecutor "did not suggest that the jurors find Petitioner guilty because the prosecutors believed him to be guilty." 2022 WL 1666895, at *25. Rather, ADA Schordine argued petitioner's guilt "based on the evidence adduced at trial . . . and appropriate inferences to be drawn from that evidence[.]" *Id*. The ADA's occasional use of the first-person plural pronoun ("we all know"), in a summation full of second-person pronouns ("you know") did not "make[] an issue of the prosecutor's credibility or impl[y] the existence of extraneous proof," and certainly did not "r[i]se to the level of prejudicial error." *United States v. Herredia*, 153 F. App'x 50, 54 (2d Cir. 2005) (rejecting claim of prosecutorial misconduct despite "twenty-two instances in which the prosecutor used a variant of the pronoun 'I' in the summation").

I note as well that the jury was properly instructed that counsel's commentary during summation did not constitute evidence:

> Summations are argument. It's their argument about what the evidence was and what conclusions they would urge you to draw or not draw from the evidence. If, what they say about the evidence in their summation is different than what you recall the evidence to be, you're to be guided by what you recall and understand the evidence to be.

Trial Tr. at 443; *see also id*. at 517-18 ("[Y]ou may accept or reject the arguments that have been made by the attorneys and use your own analysis of the evidence and decide whether the arguments are logical and consistent with the evidence as you recall it or not. . . . [I]n the end, it's your recollection of the evidence, your understanding of the evidence and your evaluation of the evidence that controls."); *id*. at 518 ("[I]t is your sworn duty as a juror to decide the case solely based upon the evidence admitted during the trial and determine – and to determine all the issues fairly, objectively and impartially, free from any bias or prejudice."); *id*. at 534 ("Whatever your verdict may be, it must not rest upon baseless speculations, nor may it be influenced in any way by bias, prejudice, sympathy[.]").

50

By giving these instructions, Justice Benitez "took cautionary steps to limit any potential prejudice to petitioner regarding statements made by the prosecutor in summation[.]" *Delancey v. Lee*, 2019 WL 9051134, at *24 (E.D.N.Y. Nov. 4, 2019), *adopted,* 2020 WL 3084285 (E.D.N.Y. June 10, 2020); *see also Harris v. Lee*, 2021 WL 37581, at *11 (S.D.N.Y. Jan. 5, 2021) (such instructions may be "sufficiently curative to address a prosecutor's alleged improper closing argument"). As the Supreme Court noted in *Richardson v. Marsh*, 481 U.S. 200 (1987), "juries are presumed to follow their instructions[.]" *Id.* at 211. In this case, moreover, the fact that the jurors rejected the attempted murder charge while finding petitioner guilty of assault and possession of a weapon buttresses that presumption, and therefore supports the conclusion that petitioner was not prejudiced by any improprieties in the People's closing argument. *See Harris*, 2021 WL 37581, at *11 ("[T]he fact that the 'jury was discriminating in its verdict' – acquitting Harris on some of the charges against him – is 'an important factor in finding [an absence of] prejudice.'") (quoting *Myerson*, 18 F.3d at 163).

"It is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (internal quotations and citation omitted). This is not one of those cases. Having carefully reviewed the People's closing argument against the federal standards set forth above, I cannot conclude that the state court erred in holding that petitioner was not deprived of a fair trial by "any improprieties" in that argument – much less that it "blundered so badly that every fairminded jurist would disagree with the decision." *Martin*, 2026 WL 189976, at *4.

## H.      Juror No. 2

Petitioner further contends that *habeas* relief is warranted because the trial court failed to excuse Juror No. 2, at the end of the first day of jury deliberations, when he stated that he no longer "want[ed] to be part of the jury." *See* Trial Tr. at 567. As noted above, Juror No. 2 declined to

provide a specific reason for his request, *id*. at 568-69, and Justice Benitez encouraged him to relax over the weekend and "see where you go from there." *Id*. at 569-70. When Juror No. 2 returned the following Monday – the day on which the jury reached a verdict – he did not renew his request to be released from the jury. *Id*. at 581-82.

Petitioner raised this claim for the first time in his January 2, 2023 unsigned supplemental letter to the Court. *See* 1/2/23 Ltr. at ECF p. 2 (alleging that "[j]uror number two . . . saw the handwriting on the wall [and] requested not to be a part of the prosecutor and Court egregious misconduct"). He did not raise any concerns regarding Juror No. 2 in his CPL § 440.10 motion, or on appeal to the Appellate Division or the New York Court of Appeals. Consequently, since petitioner did not fairly present the claim to the New York courts, it is unexhausted. *See O'Sullivan*, 526 U.S. at 845; *Triplett v. Reardon*, 2023 WL 3045737, at *17 (S.D.N.Y. Mar. 31, 2023) (petitioner failed to exhaust his state remedies as to his claim that a juror should have been excluded), *adopted*, 2023 WL 7103221 (S.D.N.Y. Oct. 27, 2023). And since "New York law does not allow for successive direct appeals," *Sanabria*, 2019 WL 4942118, at *12, the claim is now procedurally defaulted. Once again, petitioner has not set forth any reason for his failure to raise the claim in state court, nor shown that a "fundamental miscarriage of justice" would occur if the merits of this claim were not considered. *See Coleman*, 501 U.S. at 750; *Triplett*, 2023 WL 3045737, at *17.

In addition to his failure to exhaust, Petitioner has failed to identify any federal constitutional right implicated by Juror No. 2's request. The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, (1961); *see also United States v. Parse*, 789 F.3d 83, 110 (2d Cir. 2015). However, "[f]ederal law affords trial courts broad discretion to intervene to ensure that the jury comes to a

fair and impartial verdict, and the only limitation to that discretion is the requirement that there be no prejudice to the defendant through a biased jury." *Mayrant v. Wolcott*, 2025 WL 2106654, at *9 (S.D.N.Y. July 28, 2025) (internal quotations and citation omitted).

Post-trial juror discharge decisions are governed by state law, *see* CPL §§ 270.35, 270.15(3), and "are not subject to federal habeas review unless such violations implicate constitutional concerns." *Mayrant*, 2025 WL 2106654, at *9 (citing 28 U.S.C. § 2254(a)); *see also Retallack v. Demarse*, 2015 WL 10682147, at *2 (S.D.N.Y. June 8, 2015) ("An allegation of improper discharge of a juror is generally an issue of state law not cognizable on habeas review.") (collecting cases), *adopted*, 2016 WL 1529909 (S.D.N.Y. Apr. 14, 2016). Respondent argues that, "[t]o the extent Petitioner is now asserting that he was deprived of a constitutional right due to the state court's failure to comply with NYCPL § 270.35 – the statute governing the replacement and discharge of a sworn juror – this claim raises an issue of state law and, therefore, is not cognizable on federal habeas review." Resp. Mem. at 66 (quoting *Herring v. Capra*, 2016 WL 7388649, at *6 (S.D.N.Y. Nov. 2, 2016), *adopted*, 2016 WL 7378976 (S.D.N.Y Dec. 20, 2016)). I agree.

I also agree that petitioner has not shown that "the court's handling of the issue allegedly violated his constitutional right to a fair trial." Resp. Mem. at 66. Petitioner does not contend that Juror No. 2 (or any other juror) was "actually biased," *United States v. Nelson*, 277 F.3d 164, 202 (2d Cir. 2002), or otherwise incapable of discharging his duties fairly and impartially. Moreover, even if the trial judge erred in declining to dismiss Juror No. 2, "habeas relief would not be warranted as petitioner does not allege, let alone establish, that he was prejudiced by [that decision]." *Baston v. Artus*, 2010 WL 5067696, at *3 (E.D.N.Y. Dec. 6, 2010); *see also Retallack,* 2015 WL 10682147, at *2 ("the substitution of one juror with another does not raise a federal question absent allegations of bias or prejudice") (collecting cases), *adopted*, 2016 WL 1529909

(S.D.N.Y. Apr. 14, 2016); *Marte v. Thoms*, 2023 WL 8187842, at *8 (S.D.N.Y. Nov. 27, 2023) (denying habeas relief where the petitioner "failed to demonstrate that he was prejudiced by the dismissal of the juror"). Here, petitioner states only that Juror No. 2 was troubled because he "saw" and did not wish "to be a part of" what petitioner characterizes as "egregious misconduct" by both the prosecution and the trial court. 1/2/23 Ltr. at ECF p. 2. That account, if anything, implies bias or prejudice in petitioner's favor – not against him. Consequently, even if petitioner's claim was not procedurally barred, he has failed to state a cognizable federal *habeas* claim.

## I.    Ineffective Assistance of Counsel

In this Court, petitioner alleges that his trial counsel was ineffective, in that he failed to "object to prosecutorial misconduct," failed to "file a motion to suppress evidence," failed to subject the People's case to "meaningful adversarial testing" or "pursue [an] identifiable defense strategy," "made disparagement [sic] comments which tainted the mind-set of Jurors," and failed to pursue an "intoxication defense." 1/2/23 Ltr. at ECF p. 5. Petitioner first made these claims in the New York Court of Appeals (except for the allegation that his own attorney made disparaging remarks, which is new). *See* Resp. App. A-152 (counseled letter-brief, arguing that attorney London was ineffective in that he "allowed the prosecutor to engage in a shockingly broad array of misconduct in summation"); *id*. at A-170 (pro se supplement). The Court of Appeals denied all of petitioner's "remaining claims," presumably including this one, as "without merit." *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620.[16] I therefore consider the ineffective assistance of counsel claim to be exhausted, and view it through the "doubly deferential" lens described below.

---

[16] Petitioner raised his ineffective assistance of counsel claim again – albeit in a single sentence – in his CPL § 440.10 motion. *See* Resp. App. at A-217. As noted above, Justice Carter rejected that claim because petitioner failed to provide any "reasons for his belief" that his counsel was ineffective and because the record showed that all of petitioner's attorneys "exercised their duties

In order to state a claim for ineffective assistance of counsel, a petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In evaluating the first *Strickland* prong, judicial scrutiny is "highly deferential," *id.* at 689, and the petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (internal quotations and citation omitted), *reh'g denied*, 536 U.S. 976. "The record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 687)). Although ineffective assistance of counsel claims "invoke critical constitutional principles and are to be taken very seriously, they are quite often the law's equivalent of 'buyer's remorse' or 'Monday morning quarterbacking' and can be quickly resolved. Decisions by criminal defense counsel are often choices among bad alternatives[.]" *Yick Man Mui v. United States*, 614 F.3d 50, 57 (2d Cir. 2010).

To establish the second *Strickland* prong – the prejudice requirement – the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability means 'a substantial, not just conceivable, likelihood of a different result.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). The "benchmark" for an ineffective assistance claim is "whether counsel's conduct so undermined the proper

---

effectively by making appropriate pre-trial, trial, post-conviction and appellate arguments." *Id*. at A-257.

functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The petitioner bears the burden of establishing both prongs of the test: that his counsel was constitutionally deficient *and* that he was prejudiced thereby. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 687).

Where, as here, a petitioner's ineffective assistance claim has already been rejected by a state court on the merits, a federal *habeas* court, reviewing the question pursuant to § 2254(d), does not determine "whether counsel was actually ineffective but whether the state court 'applied *Strickland* to the facts of [the] case in an objectively unreasonable manner.'" *Pagan v. Lavalley*, 2017 WL 1331294, at *11 (S.D.N.Y. Jan. 18, 2017) (quoting *Bell*, 535 U.S. at 698-99); *see also Aparicio*, 269 F.3d at 95 (*habeas* court's role is limited to ensuring that the *Strickland* standard "was not unreasonably applied by the Appellate Division"). Judicial review, in this context, is thus "doubly deferential," *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)): the initial review of counsel's performance by the state court is deferential under the *Strickland* standard, and the federal *habeas* court reviews the state court's conclusion "through the deferential lens of § 2254(d)." *Jackson*, 763 F.3d at 153 (quoting *Pinholster*, 563 U.S. at 190). Petitioner carries the burden of proof throughout. *Pinholster*, 563 U.S. at 181.

Petitioner Garland has not carried his burden of proof as to any aspect of his ineffective assistance of counsel claim, which smacks of "Monday morning quarterbacking." *Yick Man Mui*, 614 F.3d at 57. Attorney London could not have been ineffective for failing to make a motion to suppress evidence, because he did make such a motion, presenting testimony and arguing vigorously (albeit unsuccessfully) that petitioner's post-arrest statements should not be admitted in evidence. Likewise, petitioner's trial counsel could not have been ineffective for making

56

disparaging statements about his own client, because petitioner identifies no such statements and the trial transcript reveals none.

It is true that trial counsel did not object to the portions of the People's summation that petitioner's appellate counsel later characterized as improper.[17] However, petitioner cannot show that counsel was constitutionally ineffective in failing to make additional objections – nor that he was thereby prejudiced – because on direct appeal the state court determined, as an alternative holding, that "[t]he bulk of the challenged remarks were either fair response to defense counsel's arguments on summation or fair comment on the evidence, and any improprieties were not so egregious as to deprive defendant of a fair trial." *Garland*, 155 A.D.3d at 529, 65 N.Y.S.3d at 170. "Since the Appellate Division held that . . . there was no basis for reversal based upon the prosecutor's summation, counsel cannot be found ineffective . . . for failing to make additional objections to the summation." *Arnold v. Supt. of Upstate Corr. Facility*, 2022 WL 18542150, at *16 (S.D.N.Y. Sept. 24, 2022), *adopted*, 2023 WL 1438729 (S.D.N.Y. Feb. 1, 2023); *see also Lumiere v. United States*, 2022 WL 866365, at *24 (S.D.N.Y. Jan. 18, 2022) (trial counsel's failure to object to prosecutor's unobjectionable summation "was not constitutionally ineffective"), *adopted,* 2022 WL 861832 (S.D.N.Y. Mar. 23, 2022); *Solano v. Keyser*, 2022 WL 22889880, at *16 (S.D.N.Y. Sept. 29, 2022) (same).

It is not clear from petitioner's filings what sort of "intoxication defense" he believes his trial counsel should have pursued. That alone is grounds for denying this branch of his ineffective assistance claim. *See United States v. Herrera*, 186 F. App'x 109, 111-12 (2d Cir. 2006) (denying ineffective assistance claims that were "entirely conclusory"). Moreover, petitioner has presented

---

[17] Defense counsel made five objections during the ADA's summation, two of which were sustained. *See* Trial Tr. at 481, 486, 507, 508, 509.

no evidence that he was intoxicated at the time of the shooting on October 9, 2010. He therefore cannot show that a competent attorney would have offered evidence of such hypothetical intoxication under PL § 15.25.[18] Nor can he establish that, had such evidence been offered, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

There is some evidence (supplied by petitioner's testimony at the suppression hearing) that he was either intoxicated or hung over when he was arrested and interrogated by the NYPD on October 11, 2010. However, counsel cannot have been constitutionally ineffective in failing to argue that petitioner's condition resulted in a coerced confession, because he did make that argument – both directly, at the suppression hearing, and indirectly, through his cross-examination of Detective O'Connell, at trial. *See*, *e.g.*, Supp. Tr. at 203 (arguing that petitioner was "not well" at the 49th Precinct and should have received medical attention); Trial Tr. at 214 (asking O'Connell whether petitioner indicated that he was hung over or needed medical attention).

Petitioner's catch-all allegations – that his trial counsel failed to subject the People's case to "meaningful adversarial testing" or "pursue [an] identifiable defense strategy," 1/2/23 Ltr. at ECF p. 5 – are "entirely conclusory," *Herrera*, 186 F. App'x at 111, and lack any support in the record. The pretrial and trial transcripts show that attorney London provided petitioner with a competent defense, including by making and arguing an appropriate suppression motion, effectively cross-examining the People's witnesses, objecting when necessary, and delivering a cogent closing argument. None of petitioner's after-the-fact complaints, whether considered singly

---

[18] Under New York law, "[i]ntoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." PL § 15.25. Thus, while not a "complete affirmative defense to a criminal charge," proof of significant intoxication can "reduce[] the gravity of the offense by negating an element of the crime charged." *Ware v. New York*, 412 F. Supp. 2d 236, 246 (W.D.N.Y. 2005).

58

or in the aggregate, demonstrates that his trial counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 687-89, 693-94. Nor has he shown a "reasonable probability" that, had his counsel tried the case differently, "the result of the proceeding would have been different." *Id.* at 694.

In short, even without AEDPA deference, there is no basis on which this Court could find that petitioner received constitutionally ineffective assistance from his trial counsel. I therefore conclude that the state courts were not unreasonable in rejecting his ineffective assistance of counsel claim.

### J.      Late Oath of Office

Lastly, I turn to petitioner's claim that Justice Carter – who denied his pretrial CPL § 30.30 motion and his post-judgment CPL § 440.10 motion – "violated **'public office law 30(1)'** by filing a late oath of office when his term began 1 January 2013 filed 4 months and 28 days late and created a vacancy in office." 1/2/23 Ltr. at ECF p. 1. Petitioner goes on to allege that during that "period of vacancy," Justice Carter "violated defendants' equal protection and due process of law," citing "NY Art. 11 section 11." *Id.*[19] Petitioner made the same claim in his supplemental pro se letter to the New York Court of Appeals. Resp. App. at A-172. It is therefore exhausted – having been presented to and rejected by the Court of Appeals along with all of petitioner's "remaining contentions," *Garland*, 32 N.Y.3d at 1096, 90 N.Y.S.3d at 620 – but meritless.

---

[19] The Court construes this as a reference to article I, § 11 of the New York Constitution, which prohibits discrimination on the basis of "race, color, ethnicity, national origin, age, disability, creed, religion, or sex, including sexual orientation, gender identity, gender expression, pregnancy, pregnancy outcomes, and reproductive healthcare and autonomy." N.Y. Const. art. I, § 11. It is not clear to this Court how New York's equal protection clause is implicated by petitioner's allegation that Justice Carter filed a "late oath of office." Nor does petitioner explain how his rights were violated during the "period of vacancy," given that Justice Carter denied his pretrial CPL § 30.30 motion on October 31, 2013 – many months *after* the date on which, according to petitioner, he filed his oath of office.

First, petitioner does not identify any federal right implicated by Justice Carter's alleged "late oath of office." In the New York Court of Appeals, as here, petitioner relied on § 30(1) of the New York Public Officers Law, which provides, in relevant part, that a state office "shall be vacant" upon the incumbent's "refusal or neglect to file his official oath or undertaking, if one is required, before or within thirty days after the commencement of the term of office for which he is chosen, if an elective office, or if an appointive office, within thirty days after notice of his appointment, or within thirty days after the commencement of such term[.]" N.Y. Pub. Off. Law § 30(1)(h). If and to the extent Justice Carter filed his oath of office "4 months and 28 days late," 1/2/23 Ltr. at ECF p. 1 (an allegation for which petitioner provides no evidence), this presents "solely a state law claim for which federal habeas provides no remedy." *Atkins v. Gonyea,* 2014 WL 199513, at *3 (S.D.N.Y. Jan. 17, 2014); *see also Theall v. Artus*, 2020 WL 819367, at *2 (N.D.N.Y. Feb. 19, 2020) ("A claim that an official lacked authority because they had not complied with a state law oath of office requirement is not one that implicates a federal right and thus does not provide a cognizable basis for federal habeas relief.").

Second, the New York Public Officers Law makes it clear that the decisions of a state court judge are valid even if the judge was late in filing his oath of office:

> If a public officer, duly chosen, has heretofore entered . . . on the performance of the duties of his or her office, without taking or filing an official oath, . . . his or her acts as such officer, so performed, shall be as valid and of as full force and effect as if such oath had been duly taken and filed[.]

N.Y. Pub. Off. Law § 15; *see also In re Gilmartin v. Tax Appeals Tribunal,* 31 A.D. 1008, 1010, 818 N.Y.S.2d 682, 684 (3d Dep't 2006) ("[A]cts performed by a public officer who has not taken and filed an official oath are as valid and effective as if the oath had been taken and filed."). Thus, any claim premised on Justice Carter's allegedly late-filed oath is also "wrong on the merits." *Atkins*, 2014 WL 199513, at *3 (explaining that "[e]ven if Justice Barrett's oath as an acting

60

Supreme Court Justice had lapsed, the petitioner's sentence remained valid under state law."); *see also Theall*, 2020 WL 819367, at *2 ("Petitioner's claim would appear to lack merit in light of New York Public Officer's Law Section 15, which deems official actions valid even in the absence of a properly executed oath of office.").

## IV.    CONCLUSION

For the reasons stated above, I recommend, respectfully, that the petition be DENIED. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I further recommend that no certificate of appealability be issued pursuant to 28 U.S.C. § 2253(c)(1)(A).

The Clerk of Court is respectfully directed to substitute "Superintendent, Marcy Correctional Facility," as the respondent in this action, *see* Fed. R. Civ. P. 25(d), and to mail a copy of this Report and Recommendation to petitioner, addressed as follows:

> Tamarkqua Garland
> DIN 15A2152
> Marcy Correctional Facility
> 9000 Old River Road
> P.O. Box 3600, Marcy, NY 13403-5000

Dated:  New York, New York
         February 10, 2026

_____
**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Jennifer L. Rochon, and delivered to Judge Rochon in accordance with her individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Rochon. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).